## KIMBALL et ux. v. THOMPSON.
### Civil Action No. 292.

District Court, D. Nebraska,
Omaha Division.

March 20, 1947.

Boyle & Boyle, of Omaha, Neb., for plaintiffs.

Kennedy, Holland, DeLacy & Svoboda, of Omaha, Neb., for defendant.

DONOHOE, District Judge.

George Kimball and Marion Kimball, husband and wife, have brought this action against Guy A. Thompson, Trustee, Missouri Pacific Railroad Company, debtor, for damages from a nuisance created by the defendant. The action was commenced in the state court, and removed on the ground of diversity of citizenship. Pursuant to stipulation, the case was tried to the court sitting without a jury.

The court now makes the following special

### Findings of Fact

1. Since 1934 or prior thereto, the plaintiff Marion Kimball has owned, and resided in, a dwelling house located at 1502 Yates Street, in the city of Omaha, Nebraska. The plaintiff George Kimball resided in this house from the time of his marriage to Mrs. Kimball in 1937 until April, 1942, when he entered military service. Both plaintiffs are citizens and residents of the state of Nebraska.

2. The Missouri Pacific Railroad Corporation in Nebraska is now, and was at the time of the commencement of this action, a corporation organized and carrying on business under and by virtue of the laws of the state of Delaware with its principal place of business in St. Louis, Missouri. The defendant trustee is now, and was at the time of the commencement of this action, a citizen and resident of the state of Missouri.

3. Since 1926 and prior thereto the Missouri Pacific Railroad Corporation in Nebraska has been a common carrier of freight and passengers, and has operated an extensive and busy switchyard located immediately east of the plaintiffs' house in the city of Omaha. This yard has been operated by the defendant Thompson since his appointment as trustee of the Missouri Pacific Railroad Corporation in Nebraska to effect a plan of reorganization under the Bankruptcy Law, as amended, 11 U.S.C.A. § 1 et seq.

4. This switchyard, insofar as it is operated by the defendant, is comprised of a main line track and ten tracks located immediately west thereof; the most westerly track being situated at the foot of a bluff.

about one hundred or one hundred twenty-five feet east of the plaintiffs' house.

5. All Missouri Pacific freight trains coming into and leaving Omaha were, during the time involved in this action, broken up and made up in this yard. Between one thousand and eleven hundred freight cars were handled there daily. The switching operations were performed by yard or switch crews using steam switch or yard engines which burned coal.

6. Fourteen separate yard or switch crews were employed by the defendant in the switchyard. Each crew worked an eight-hour shift commencing at different times throughout the day and night, to-writ: at 6:30, 7:00, or 8:00 A.M., or at 2:30, 2:45, 3:00, 4:00, 10:30 or 11.00 P.M., or at 12:00 midnight. During the eight-hour shift, each crew had a period of twenty minutes for lunch. Some of the crews had separate engines; others made so-called foot board changes, in which the crew going to work took over an engine which had been in use.

7. Pursuant to requirements of the Interstate Commerce Commission and regulations of the railroad, each engine which was continued in use through a second shift was inspected by the engineer immediately before going off duty and also by the engineer then coming on duty. These inspections took about twenty minutes and could be made only when the engine was standing still. While the inspection was being made by the on-coming engineer, his fireman shook the grates in the engine to get rid of ashes and built up the fire by adding coal. This process caused the engine to emit large quantities of smoke, soot, cinders and steam. Preparation of the engine for work immediately after the crew had its lunch produced similar results.

8. The defendant's Grace Street yard office is located on the west side of the defendant's switchyard, adjoining the most westerly track, and one block south from the plaintiffs' house. Two box cars were located on the ground a few feet north of the yard office building during the time involved in this action. These box cars were used as locker and lunch rooms by the defendant's yard and switch crews.

9. For personal convenience of the crews, and also by reason of an agreement between the railroad and certain railroad labor organizations, most of the defendant's yard and switch crews changed shifts and ate lunch at the lunch and locker rooms near the Grace Street yard office. During the luncheon period and while crews were changing shifts, engines which had been in use in other parts of the yard were brought in and left standing idle for about twenty minutes on the scale track (which is the most westerly one and the one nearest to the plaintiffs' house), or on the track just east of the scale track.

10. The plaintiffs in this action do not claim damage or injury by smoke, soot, cinders or steam from engines spotted at the Grace Street yard office and lunch and locker rooms, or from engines in operation and moving in the defendant's switchyard.

11. Commencing in 1937, and continuing until the time of the filing of the plaintiffs' amended petition in the state court (November 19, 1941), and since that time, an engine in the defendant's switchyard was spotted for a period of about twenty minutes four or five times each day at points north of the Grace Street yard office and lunch and locker rooms and more closely to the plaintiffs' house; that is, either directly east from the house or somewhat southeast of it. The engine on these occasions was usually spotted on the scale track, but sometimes it was left on the track just east of the scale track.

12. The engine which had been spotted, as referred to in special finding No. 11, stood idle and unattended while the crews changed shifts, ate lunch or were absent for other reasons. While the engine stood in this location, excessive and unreasonable amounts of smoke, soot, cinders and steam were carried to and cast upon the plaintiffs' house and premises, especially when an east or southeasterly wind prevailed.

13. The evidence does not establish that it was necessary in the ordinary and practical operation of the defendant's switchyard to spot engines regularly at the points described in special finding No. 11.

14. This smoke, soot, cinders and steam from these engines standing idle near the plaintiffs' house as described in special find-

ings Nos. 11 and 12 killed vegetation in the plaintiff's yard, caused paint or other finish on the outside of the plaintiffs' house to blister and peel, prevented the plaintiffs from opening their windows or using their porch at night, caused draperies, curtains, bedspreads and other linens to deteriorate and rot, penetrated the floors and woodwork, and increased the depreciation and deterioration of the house over and above the depreciation and deterioration caused by ordinary wear and tear due to smoke from necessary and regular operations of engines in the defendant's switchyard.

15. The smoke, soot, cinders and steam carried to and cast upon the plaintiffs' house and premises from idle engines which had been spotted by the defendant's employees as described in special findings Nos. 11 and 12 created and constituted, with respect to the plaintiffs, an unnecessary nuisance which did not arise out of the ordinary, necessary and practical operation of the defendant's switchyard.

16. As a direct and proximate result of this unnecessary nuisance created by the defendant's employes, the damage and injury to the plaintiffs and their property was unnecessarily accelerated and increased over and above the damage and injury due to smoke from necessary and regular operation of engines in the switchyard, and was special to the plaintiffs and in excess of that sustained by others owning homes in the vicinity of the plaintiffs' house.

17. The plaintiff Marion Kimball upon numerous occasions requested the defendant's employes, including the train master and chief operating officer, to move engines spotted near the plaintiffs' house. These requests were of no avail to the plaintiffs.

18. The unnecessary nuisance created by the defendant's employes could have been abated by the defendant.

19. While the evidence as to the exact amounts of specific items of damage is somewhat uncertain, rendering ascertainment of these amounts difficult, the evidence establishes with certainty that the plaintiffs have suffered damages as a direct and proximate result of the unnecessary nuisance created by the defendant's employes. Certain items of damage, such as interference with use of the plaintiffs' porch and windows, annoyances and discomfort from smoke, and the difference in the amount of damage to the plaintiffs' house from the unnecessary nuisance and the amount which would have been caused by ordinary, necessary and regular operation of engines can not be readily measured in a monetary way. Changes in the direction and velocity of the wind produced variations in the amount of damages.

20. Under all of the evidence the court finds in favor of the plaintiffs, and, in the exercise of sound discretion and good judgment, fixes and assesses the sum of $250.00 per year, or $1,000, for the four-year period involved in this action, as a fair and reasonable amount of compensation for damages to the plaintiffs.

## Opinion

The principal issue in this action centers around the question of whether a railroad is liable to owners of residential property for damages from a private nuisance created by smoke, soot, cinders and steam from engines standing idle at points in a switchyard near the property owners' house.

Brief reference to some of the principles pertaining to smoke as a nuisance is in order at this point.

The Supreme Court of Nebraska, speaking through Commissioner Duffie in Francisco v. Furry, 1908, 82 Neb. 754, 756, 118 N.W. 1102, 1103, said: "The right to have the air floating over one's premises free from noxious and unnatural impurities is a right as absolute as the right to the soil itself, although there are certain uses of property that necessarily impart more or less impurity to the air which are regarded as lawful when reasonably exercised, and must be submitted to as among the incidents of living in a town or thickly settled districts." See also Wood on the Law of Nuisances, 2d Ed. Secs. 495, 496; Joyce on Nuisances, Sec. 140.

In Wood on the Law of Nuisances, 2d Ed., Sec. 496, it is said that: "By an atmosphere free from artificial impurities is meant, not air as free and pure as it naturally is, entirely devoid of impregnation

from artificial cause, but an atmosphere as free and pure as could reasonably be expected in view of the location, and its business."

■ Smoke is not a nuisance per se, 39 Am.Jur., p. 336; Joyce on Nuisances, Sec. 137; but smoke or smoke and soot constitute an actionable nuisance where they are emitted in unreasonable amounts, in view of the surroundings, and produce actual and substantial injury to neighboring property or materially interfere with its use and enjoyment by persons of ordinary sensibilities; the question depending upon the circumstances in each particular case. Richards v. Washington Terminal Co., 233 U.S. 546, 34 S.Ct. 654, 58 L.Ed. 1088, L.R.A.1915A, 887; Baltimore & Potomac R. Co. v. Fifth Baptist Church, 108 U.S. 317, 2 S.Ct. 719, 27 L.Ed. 739; McGill v. Pintsch Compressing Co., 140 Iowa 429, 118 N.W. 786, 20 L.R.A.,N.S., 466; 39 Am.Jur., pp. 336, 337; Wood on the Law of Nuisances, 2d Ed., Secs. 505, 506, 507; Joyce on Nuisances, Sec. 135, 137. See also State ex rel. Krittenbrink v. Withnell, 91 Neb. 101, 105, 135 N.W. 376, 40 L.R.A.,N.S., 898; Walling v. City of Fremont, 138 Neb. 399, 293 N.W. 226. Smoke may constitute a nuisance although occasioned only at intervals. 39 Am.Jur., p. 337.

■ With respect to liability for nuisances generally, the defendant's acts must be the direct and proximate cause of the creation of the nuisance, and the nuisance must be the proximate cause of the injury and damage to the plaintiff. It is not necessary that the annoyance be of such a character as to endanger health; it being sufficient if it occasions that which is offensive to the senses and renders the enjoyment of life and property uncomfortable or prevents its enjoyment in as full and ample a manner as before. If the enjoyment of life and property has been so rendered uncomfortable, it is not indispensable to sustain a right of action that one has been, by the annoyance or nuisance, driven from his place of habitation. Joyce on Nuisances, Sec. 19.

The defendant's side of this lawsuit is grounded primarily upon the general rule that the operation of a railroad in an ordinarily prudent manner, without negligence, does not, by reason of the attendant noise, smoke or other objectionable features necessarily incident thereto, and which are common to the public at large, constitute an actionable nuisance. It is the defendant's position that the damages of which the plaintiffs now complain have been incident to the necessary and ordinary operation of the engines in the switchyard and that, in the absence of any proof of negligence, no liability attaches to the defendant. It is claimed that the ordinary law of nuisances does not apply to railroads because of their nature as public agencies and essential instrumentalities of commerce.

While this court is not disposed to disregard or overlook the public interest in railroads and the necessity for comparative freedom in carrying out their functions as common carriers, the court reaches the conclusion that the defendant is liable in the circumstances of this case.

■ The court has found on conflicting evidence that commencing in 1937 and continuing thereafter, the defendant's employes spotted an engine for about twenty minutes four or five times each day at points in the switchyard immediately east of the plaintiffs' house; that the engine was left unattended while the employes ate lunch, changed shifts, or were absent for other reasons; and that while the engine stood in this location, excessive and unreasonable amounts of smoke, soot, cinders and steam were cast upon the plaintiffs' property, particularly when the wind was in the east or southeast. The court has further found that it was not necessary in the ordinary and practical operation of the switchyard to persistently and regularly spot engines at this location, and that as a direct and proximate result of the acts of the defendant's employes the plaintiffs suffered injury and damage over and above or in addition to that which was incident to normal and regular operation of the switchyard and in excess of that sustained by others in the same vicinity.

Under these circumstances, the general rule for which the defendant contends and

the cases cited in support of that rule[1] do not apply.

It seems to be well established that general legislative grants of privileges or powers to railroads to construct and operate their roads and such other works and appurtenances as are necessary and expedient for maintenance and operation of the roads do not authorize them to create and maintain a nuisance to private property by the location and use of their property in such an unreasonable and heedless way as to materially interfere with the use and enjoyment of private property. Baltimore & Potomac R. Co. v. Fifth Baptist Church, supra; Richards v. Washington Terminal Co., supra; Chicago G. W. R. Co. v. First Methodist Church, 8 Cir., 102 F. 85, 50 L. R.A. 488.

The holding of the Supreme Court in Richards v. Washington Terminal Co., 233 U.S. 546, 34 S.Ct. 654, 58 L.Ed. 1088, L.R. A.1915A, 887, is persuasive in the instant action. In the Richards case, the owner of a dwelling house, the rear windows of which opened in the direction of tracks leading from the defendant's tunnel, brought an action for damages from the maintenance of a nuisance by the defendant through the operation of a railroad and tunnel upon the defendant's land in the District of Columbia near to, but not adjoining, the plaintiff's lot.

The plaintiff's house was located 114 feet from the south portal of the tunnel, and the evidence established that the plaintiff's property had been damaged by smoke, dust, dirt, cinders and gases from trains while passing over the tracks and in or out of the tunnel, or standing upon the tracks near a signal tower. It appeared that a fanning system installed in the tunnel caused gas and smoke from engines in the tunnel to be forced out of the south portal, thus contaminating the air and adding to plaintiff's inconvenience in the occupation of his house. There was evidence of the depreciation in value of the house and furniture due to the smoke and cinders and that these elements contaminated the air and rendered the house objectionable as a habitation. No claim was made by the plaintiff that the tunnel, tracks or trains were constructed, operated, or maintained in a negligent manner, and it was conceded that the tunnel and tracks were built upon property acquired by purchase or condemnation, and were constructed under authority of Acts of Congress and permits issued by the Commissioners of the District of Columbia.

At p. 551 of 233 U.S., at page 656 of 34 S.Ct., 58 L.Ed. 1088, L.R.A.1915A, 887, the Supreme Court said:

"Such being the essential facts to be deduced from the evidence, we have reached the conclusion, for reasons presently to be stated, that with respect to most of the elements of damage to which the plaintiff's property has been subjected, the courts below correctly held them to be damnum absque injuria; but that with respect to such damage as is attributable to the gases and smoke emitted from locomotive engines while in the tunnel, and forced out of it by means of the fanning system through a portal located so near to plaintiff's property that these gases and smoke materially contribute to injure the furniture and to render the house less habitable than otherwise it would be, there is a right of recovery.

"The acts of Congress referred to, followed by the construction of the tunnel and railroad tracks substantially in the mode prescribed, had the effect of legalizing the construction and operation of the railroad, so that its operation, while properly conducted and regulated, cannot be deemed to be a public nuisance. Yet it is sufficiently obvious that the acts done by defendant, if done without legislative sanction, would form the subject of an action by plaintiff to recover damages as for a private nuisance."

[1] Beseman v. Pennsylvania R. Co., 50 N.J.L. 235, 13 A. 164; Bennett v. Long Island R. Co., 181 N.Y. 431, 74 N.E. 418; Taylor v. Chicago etc. R. Co., 85 Wash. 592, 148 P. 887, L.R.A.1915E, 634; Carroll v. Wisconsin Central R. Co., 40 Minn. 168, 41 N.W. 661; Kilcoyn v. Chicago etc. R. Co., 141 Ky. 237, 132 S.W. 438; Thomason v. Seaboard Air Line Ry. Co., 142 N.C. 318, 55 S.E. 205; Taylor v. Seaboard Air Line Ry., 145 N.C. 400, 59 S.E. 129, 122 Am.St.Rep. 455; Bennett v. Lake Erie & W. R. Co., 74 Ind.App. 156, 127 N.E. 777; Ball v. New York Central R. Co., 229 N.Y. 33, 127 N.Y. 33, 127 N.E. 493.

After referring to cases in the courts of England, the court continued, 233 U.S. at pages 553 and 554, 34 S.Ct. at page 657, 58 L.Ed. 1088, L.R.A.1915A, 887:

"Thus it has been said that 'a railroad authorized by law and lawfully operated cannot be deemed a private nuisance;' that 'what the legislature has authorized to be done cannot be deemed unlawful,' etc. These and similar expressions have at times been indiscriminately employed with respect to public and to private nuisances. We deem the true rule, under the 5th Amendment, as under state constitutions containing a similar prohibition, to be that while the legislature may legalize what otherwise would be a public nuisance, it may not confer immunity from action for a private nuisance of such a character as to amount in effect to a taking of private property for public use. (citing cases)

"But the question remains, in cases of the class now before us, What is to be deemed a private nuisance such as amounts to a taking of property? And by a great and preponderant weight of judicial authority in those states whose constitutions contain a prohibition of the taking of private property for public use without compensation, substantially in the form employed in the 5th Amendment, it has become established that railroads constructed and operated for the public use, although with private capital and for private gain, are not subject to actions in behalf of neighboring property owners for the ordinary damages attributable to the operation of the railroad, in the absence of negligence. Such roads are treated as public highways, and the proprietors as public servants, with the exemption normally enjoyed by such servants from liability to private suit, so far as concerns the incidental damages accruing to owners of non-adjacent land through the proper and skillful management and operation of the railways. Any diminution of the value of property not directly invaded nor peculiarly affected, but sharing in the common burden of incidental damages arising from the legalized nuisance, is held not to be a 'taking' within the constitutional provision. The immunity is limited to such damages as naturally and unavoidably result from the proper conduct of the road and are shared generally by property owners whose lands lie within range of the inconveniences necessarily incident to proximity to a railroad. It includes the noises and vibrations incident to the running of trains, the necessary emission of smoke and sparks from the locomotives, and similar annoyances inseparable from the normal and non-negligent operation of a railroad."

Continuing, 233 U.S. at page 554, 34 S. Ct. at page 657, 58 L.Ed. 1088, L.R.A. 1915A, 887, the Supreme Court pointed out:

"That the constitutional inhibition against the taking of private property for public use without compensation does not confer a right to compensation upon a landowner, no part of whose property has been actually appropriated, and who has sustained only those consequential damages that are necessarily incident to proximity to the railroad, has been so generally recognized that in some of the states (Arkansas, California, Colorado, Georgia, Illinois, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, South Dakota, Texas, West Virginia, and Wyoming are, we believe, among the number) constitutions have been established providing in substance that private property shall not be taken *or damaged* for public use without compensation."

The court went on to say, 233 U.S. at page 555, 34 S.Ct. at page 657, 58 L.Ed. 1088, L.R.A.1915A, 887, that:

"But the doctrine (of immunity of railroads from liability for incidental injury), being founded upon necessity, is limited accordingly. This court, in a leading case that we deem controlling upon the questions now at issue, had occasion to recognize this, and at the same time to apply the distinction between public and private nuisances with respect to the private right of action. In Baltimore & Potomac, R. R. Co. v. Fifth Baptist Church, 108 U.S. 317 [at page 331], 2 S.Ct. 719, 27 L.Ed. 739, the court, while recognizing that the legislative authority for operating a railway carried with it an immunity from private actions based upon those incidental inconveniences that are unavoidably at-

tendant upon the operation of a railroad, nevertheless sustained the right of action in a case where a building for housing and repairing locomotive engines was unnecessarily established in close proximity to a place of public worship and so used that the noises of the shop and the rumbling of the locomotive engines passing in and out, the blowing off of steam, the ringing of bells, the sound of whistles, and the smoke from the chimneys, created a constant disturbance of the religious exercises."

After further discussion of the case of Baltimore & Potomac R. Co. v. Fifth Baptist Church, the court, 233 U.S. at page 556, 34 S.Ct. at page 658, 58 L.Ed. 1088, L.R.A.1915A, 887 said:

"The present case, in the single particular already alluded to,—that is to say, with respect to so much of the damage as is attributable to the gases and smoke emitted from locomotive engines while in the tunnel, and forced out of it by the fanning system therein installed, and issuing from the portal located near to plaintiff's property in such manner as to materially contribute to render his property less habitable than otherwise it would be, and to depreciate it in value; and this without, so far as appears, any real necessity existing for such damage,—is, in our opinion, within the reason and authority of the decision just cited."

And 233 U.S. at page 557, 34 S.Ct. at page 658, 58 L.Ed. 1088, L.R.A.1915A, 887:

"The case shows that Congress has authorized, and in effect commanded, defendant to construct its tunnel with a portal located in the midst of an inhabited portion of the city. The authority, no doubt, includes the use of steam locomotive engines in the tunnel, with the inevitable concomitants of foul gases and smoke emitted from the engines. No question is made but that it includes the installation and operation of a fanning system for ridding the tunnel of this source of discomfort to those operating the trains and traveling upon them. All this being granted, the special and peculiar damage to the plaintiff as a property owner in close proximity to the portal is the necessary consequence, unless at least it be feasible to install ventilating shafts or other devices for preventing the outpouring of gases and smoke from the entire length of the tunnel at a single point upon the surface, as at present. Construing the acts of Congress in the light of the 5th Amendment, they do not authorize the imposition of so direct and peculiar and substantial a burden upon plaintiff's property without compensation to him. If the damage is not preventable by the employment at reasonable expense of devices such as have been suggested, then plaintiff's property is 'necessary for the purposes contemplated,' and may be acquired by purchase or condemnation (32 Stat. [909,] 916, c. 856, § 9), and pending its acquisition defendant is responsible. If the damage is readily preventible, the statute furnishes no excuse, and defendant's responsibility follows on general principles."

As pointed out by the Supreme Court in the Richards case, the provisions of the constitution of Nebraska concerning the taking of private property for public use are different from those found in the constitutions of many states. This fact must be borne in mind when considering the cases cited by the defendant, and it is observed that most of these cases arose in jurisdictions having constitutional provisions different from those existing in the constitution of this state. In Matthias v. Minneapolis, St. P. & S. S. M. R. Co., 125 Minn. 224, 146 N.W. 353, 354, 51 L.R. A., N.S., 1017, it is noted that the case of Carroll v. Wisconsin Central R. Co., 40 Minn. 168, 41 N.W. 661, now quoted in the defendant's brief, was decided before the adoption of the constitutional amendment providing that compensation must be paid for damaging or destroying private property for public use, as well as for taking the same. This amendment adding the words "destroyed or damaged" to the constitution of Minnesota was officially proclaimed on December 29, 1896. See The State Constitutions by Kettleborough (1918), p. 711.

In the Matthias case (1914), the defendant railroad constructed in the vicinity of the plaintiff's home a switchyard for

handling shipments of grain. About 600 feet from the plaintiff's house, the defendant erected a hump from which cars were kicked or shunted in on the proper tracks. The plaintiff then brought an action for damages on the ground that defendant had created a private nuisance. In reversing a judgment dismissing the action on the defendant's motion after the plaintiff had rested, the Supreme Court of Minnesota said, 146 N.W. at pages 354, 355:

"It is not necessary to pursue this subject further for plaintiff concedes the soundness of the rule generally adopted that disturbance, smoke, dust and cinders from the ordinary operations of trains upon a railroad's right of way which reach adjacent properties causing discomfort and damage to the owners or occupants thereof do not give rise to a cause of action. But he insists that a different rule applies to such facilities in railroading as shops, roundhouses, and switchyards, so that, when a railroad company selects such a place for these that the operation thereof creates a private nuisance to owners of nearby property, a cause of action arises in every case where a like injury inflicted by a private person would be actionable.

"Courts have distinguished between the location and operation of a railroad between and at stations, and the location and operation of such incidental but necessary equipments as railroad shops, roundhouses and switchyards like the one here in question. These latter do not serve the public directly. Their location and operation is of no public concern except as indirectly affecting the transportation problem. In selecting a place for these, the railroad acts as an individual attending to his private business and must be responsible as such for injuries to the property rights of others flowing from such selection and subsequent operation. In other words, in the location and operation of these incidental transportation facilities the railroad company has a free hand and may not shield itself from responsibility for damage to others behind any rule of public necessity or authorization by law."

The court said, 146 N.W. at page 356 that: "It would seem to follow that if this switchyard, although properly located and operated, constitutes a private nuisance to plaintiff's use and enjoyment of his property, there is an injury to private property by a public use for which compensation must be' made under the Constitution of this state as it now reads." (Section 13 of Article 1 of the Constitution of Minnesota then provided "Private property shall not be taken, destroyed, or damaged for public use without just compensation therefor, first paid or secured." The State Constitutions by Kettleborough, 1918, p. 711.)

In commenting upon the law of Nebraska, the Supreme Court of Minnesota, 146 N.W. at pages 356, 357, said that:

"The decisions in Nebraska, which however go further than in any other state, uniformly hold that injurious consequences to property such as shown herein from the operation of a railroad is an injury or damage within the constitutional provisions requiring compensation, and that without regard to whether it proceeds from the operation of the railroad between stations, or from shops and the like. Chicago K. & N. R. Co. v. Hazels, 26 Neb. 364, 42 N.W. 93; Omaha, etc. Ry. Co. v. Janecek, 30 Neb. 276, 46 N.W. 478, 27 Am.St.Rep. 399; Chicago etc. Ry. Co. v. O'Neill, 58 Neb. 239, 78 N.W. 521; Stehr v. Mason City, etc. Ry. Co., 77 Neb. 641, 110 N.W. 701, 124 Am.St.Rep. 872; and Kayser v. Chicago, etc. Ry. Co., 88 Neb. 343, 129 N.W. 554. Judge Hook, in Mason City, etc., Ry. Co. v. Wolf, [8 Cir.,] 148 F. 961, 78 C.C.A. 589, in summing up the law as it obtains in Nebraska, states: 'The right of recovery under the state Constitution is not limited to those cases in which the property of a private owner is actually invaded or appropriated by a railroad company. It extends to cases where the value of the property is depreciated by the disturbance of some right, either public or private, which the owner enjoys in connection therewith. * * * The right of recovery includes damage to the property from noise, smoke, cinders, and vibrations of the ground, and

the obstruction or impairment of the right of the owner to make use of public highways in the vicinity.'"

Section 13 of Article 1 of the Nebraska Constitution of 1866 provided that: "The property of no person shall be taken for public use without just compensation therefor." This provision was later amended by adding the words "or damaged"; the Constitution now providing that: "The property of no person shall be taken or damaged for public use without just compensation therefor." See Constitution of Nebraska 1875, Article 1, Section 21.

■ Under Nebraska law it is not necessary that any part of an individual's property be actually taken for public use to entitle him to compensation under the Constitution. If by reason of public improvement private property is depreciated in value, the owner may recover damages which are special to him and not common to the public at large. Gottschalk v. Chicago B. & Q. R. R. 14 Neb. 550, 560, 16 N.W. 475, 17 N.W. 120; City of Omaha v. Kramer, 25 Neb. 489, 41 N.W. 295, 13 Am.St.Rep. 504; Omaha & N. P. R. Co. v. Janecek, 30 Neb. 276, 46 N.W. 478, 27 Am.St.Rep. 399; Stehr v. Mason City & Ft. Dodge Ry. Co., 77 Neb. 641, 110 N.W. 701, 124 Am.St.Rep. 872. But a landowner can not ordinarily recover on account of a lawful public improvement for damages that he suffers in common with the public generally, though his loss may be greater in degree. Lowell v. Buffalo County, 119 Neb. 776, 230 N.W. 842; Scully v. Central Public Power & Irrigation Dist., 143 Neb. 184, 9 N.W.2d 207. However, this rule does not prevent recovery for special damages. . Lowell v. Buffalo County, supra.

■ The words "or damaged" were inserted in the Constitution with the intention of giving a right of recovery which did not previously exist, Omaha & R. V. R. Co. v. Standen, 22 Neb. 343, 35 N.W. 183, and these words include all damages arising from the exercise of eminent domain which cause a diminution in the value of private property. City of Omaha v. Kramer, supra; Lowell v. Buffalo County, supra. "Where there has been a disturbance of a right which the owner of real estate possesses in connection with his estate and which gives it additional value, by reason of which disturbance he sustains special injury in respect to such property in excess of that sustained by the public at large, he is entitled to recover all the damages, both direct and consequential, which may result from such invasion of his property rights." Stehr v. Mason City & Ft. Dodge R. Co., supra, 77 Neb. at page 646, 110 N.W. at page 703, 124 Am.St.Rep. 872.

In the Stehr case, the defendant railroad constructed a terminal freight station a few blocks from the plaintiff's house in the city of Omaha. Tracks leading from the main line to the station were laid in the bottom of a deep cut which was made partly upon land belonging to the railroad and partly in Nineteenth Street, which intersected Mason Street about 50 feet north of the plaintiff's lot; the lot fronting upon Nineteenth Street. About one-half of the width of Nineteenth Street was cut away in front of the lot. Plaintiff brought an action for damages complaining that the defendant had changed the natural surface of the ground in front of plaintiff's lot; that the plaintiff had been deprived of ready access to certain streets; that the plaintiff's property had been damaged from concussions caused by passing engines, and that occupants of the property were annoyed by smoke, cinders, soot and noise from the engines.

After commenting that the evidence showed direct injury and depreciation in the value of the plaintiff's property as the result of the defendant's acts, Judge Letton, 77 Neb. at pages 644 and 645, 110 N.W. at page 702, 124 Am.St.Rep. 872, said:

"Further than this, the evidence shows that on account of the proximity of the railway smoke and soot is blown upon her property to such an extent as to make the property less desirable as a place of residence, to lessen its value in the market, and to depreciate its rental value. It is not a direct physical injury

to the real estate, itself but it is a special injury to the property in excess of that sustained by the public at large, and the owner of the property suffers damage to her right of access and to her right of free and undisturbed enjoyment."

In Omaha & N. P. R. Co. v. Janecek, supra, defendant railroad erected an engine house, a turntable and a coal shed on land which it purchased in the town of Schuyler, Nebraska. The plaintiff, owning a residence located about 80 feet from the engine house, brought an action to recover damages for the depreciation in value of his property. The evidence disclosed that engines moving over tracks near the plaintiff's house made disturbing noises, and that the engines threw smoke, soot and cinders upon the plaintiff's property.

After holding that the plaintiff's right to recover was based upon Section 21 of Article 1 of the Constitution of Nebraska, the Supreme Court of Nebraska said, 30 Neb. at page 278, 146 N.W. at page 478, 27 Am.St.Rep. 399:

"In the case at bar the plaintiff's property is depreciated in value by the noise caused by the operation of the defendant's engines and cars in front of his premises, and in close proximity to his house, by the casting of soot, smoke, and cinders upon his property, and by the vibration of his house. The plaintiff has sustained special damages by the construction and operation of the railroad near his premises, in excess of that sustained by the community at large. Smoke, soot, and cinders are not thrown upon property situated a few blocks from the road, nor does the moving of trains jar buildings that are distant from the track. The fact that the property of a dozen or more owners in the town is materially injured by the location of the defendant's roads, does not affect the plaintiff's right to compensation for the depreciation in value of his property."

In the concluding paragraph of its opinion, the Supreme Court used this language: "The rule established by the decisions of this court, and by the recent adjudicated cases of most of the other states, is to the effect that, if the property of an individual has been depreciated in value, by reason of

smoke, soot, and cinders being thrown upon his property by passing engines, he may recover the damages thus sustained."

This court particularly notes that in the Janecek case, the Supreme Court of Nebraska applied the constitutional provisions in dealing with a private property owner's right of recovery for damages growing out of or connected with the erection and operation of a roundhouse and coal shed; the same being facilities which, according to the holdings in some jurisdictions, are operated by railroads in a private, as distinguished from a public, capacity.

Applying the principles established by the Supreme Court of Nebraska in the foregoing and other cases, we now hold that in the circumstances of this particular action the plaintiffs have a right of recovery under the Constitution of this state. In other words, the acts or omissions of the defendant's employes in operating engines in the switchyard have led to a damaging of private property for public use within the meaning and intendment of the Constitution.

The facts here, as found on conflicting evidence, are that after the plaintiff Marion Kimball acquired her property this property was subjected to a new and additional burden and damage over and above that previously imposed upon the property by the construction of the defendant's switchyard and the necessary and regular operation of engines in that yard. For this new and additional burden and damage, the plaintiffs now have a right of redress. Cf. Chicago B. & Q. R. Co. v. O'Connor, 42 Neb. 90, 60 N.W. 326. Whether the defendant's employes were guilty of negligence is immaterial if the plaintiffs are otherwise entitled to recover under the Constitution as it now exists. Gledhill v. State, 123 Neb. 726, 731, 243 N.W. 909.

We do not overlook the fact that in most of the cases cited heretofore in this memorandum, the plaintiff was suing for injury and damage to property which he owned before the railroad encroached upon the plaintiff's property rights. That fact does not serve to distinguish or render inapplicable the reasoning in these cases, since we are here dealing with a right of action

for a new and additional injury and damage inflicted and arising after the plaintiff Marion Kimball bought her residence.

The defendant contends that the plaintiff Marion Kimball bought the property with notice or knowledge that it was situated near a busy railroad yard; that no changes were made in the modes of operation in the yard after 1926; and that "the railroad was there first," and was not bound to follow the precise pattern of operation which may have existed when the plaintiff bought her property. It is also contended by the defendant that it must be presumed that all damages incident to operation of the switchyard in close proximity to the plaintiff's house were recovered by the person owning this property when the switchyard was built, and that any depreciation in value due to the presence of the switchyard was reflected in the purchase price which was paid by the plaintiff.

These contentions are without merit in view of the court's findings of fact under the conflicting evidence in this case. Nor is there any persuasive effect in the defendant's argument that to have changed the location for spotting engines would have been impracticable and would have resulted merely in exchanging one plaintiff for another. Even if spotting the engines elsewhere might have resulted in the creation of an actionable nuisance with respect to other property owners, that fact can not justify creating a nuisance as to the plaintiff by consistently parking engines at a point near her house under a mistaken notion or hope that this particular plaintiff would bear all the additional burden without bringing an action for damages.

Some point is made by the defendant over the fact that the plaintiffs abandoned the theory set up in their original petition filed in the state court. In the original petition, the plaintiffs complained of a practice by the defendant's employes of blowing off steam from engines against and into the high clay bank located between the plaintiffs' property and the defendant's tracks; this practice having allegedly existed from May, 1933, until the time of the commencement of the action. The claim set up in the amended petition is predicated upon allegations that since the summer of 1937 the defendant's employes have spotted engines on the tracks near the plaintiffs' house, and that these engines have been caused to emit large amounts of smoke, soot, cinders and steam which have been cast upon the plaintiff's property.

This change or shift in the theory of the plaintiffs' case is not fatal to recovery, particularly in view of the prevailing practice of making final disposition of actions on the evidence and not on the pleadings. Even if it were determined that the allegations of the amended petition are inconsistent with those in the original petition, the original petition, while admissible as an admission contrary to the claims asserted in the amended petition, would not be conclusive but would merely be evidence to be considered and given such weight as the trier of fact deems it to be entitled. Miller v. Nicodemus, 58 Neb. 352, 78 N.W. 618 (Opinion by Commissioner Ragan—1899)

The question of damages remains for consideration; it being the defendant's contention that the plaintiffs have failed to carry the burden of proving damages.

While "The rule is that damages which are uncertain, contingent, conjectural, or speculative, cannot be made the basis of a recovery, whether applied to the existence, nature, or proximate cause thereof." Harper v. Young, 139 Neb. 624, 626, 298 N.W. 342, 344, uncertainty which prevents a recovery of damages is uncertainty as to the fact or cause of damage and not as to the amount. 78 A.L.R. 858 note, 17 C.J., pp. 756, 757; 25 C.J.S., Damages, § 28. Where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude recovery, particularly where, from the nature of the case, the extent of injury and amount of damage are not capable of exact and accurate proof. 15 Am.Jur. p. 414.

Damages are not speculative merely because they can not be computed with mathematical exactness, if, under the evidence they are capable of reasonable approximation. Hawkinson v. Johnston, 8 Cir., 122 F.2d 724, 137 A.L.R. 420.

The proof must show with reasonable certainty that plaintiff suffered

damages, and that they resulted from the wrongful act or omission charged against the defendant. After the cause and existence of damages have been established with sufficient certainty, recovery will not be denied because the amount of damages is difficult of ascertainment, and, in such case, the amount may be fixed by the jury in the exercise of a sound discretion under proper instructions. Calkins v. F. W. Woolworth Co., 8 Cir., 27 F.2d 314.

In Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, at pages 563, 564, 51 S.Ct. 248, 250, 75 L.Ed. 544, Justice Sutherland said:

"Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise. (citing cases) As the Supreme Court of Michigan has forcefully declared, the risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party. Allison v. Chandler, 11 Mich. 542, 550-556. That was a case sounding in tort, and [11 Mich.] at page 555 the court, speaking through Christiancy, J., said:

" 'But shall the injured party in an action of tort, which may happen to furnish no element of certainty, be allowed to recover no damages (or merely nominal), because he cannot show the exact amount with certainty, though he is ready to show, to the satisfaction of the jury, that he has suffered large damages by the injury? Certainty, it is true, would thus be attained; but it would be the certainty of injustice. * * *

" 'Juries are allowed to act upon probable and inferential as well as direct and posi-

tive proof. And when, from the nature of the case, the amount of the damages cannot be estimated with certainty, or only a part of them can be so estimated, we can see no objection to placing before the jury all the facts and circumstances of the case, having any tendency to show damages, or their probable amount; so as to enable them to make the most intelligible and probable estimate which the nature of the case will permit.' "

In Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U.S. 359, at page 379, 47 S.Ct. 400, at page 405, 71 L.Ed. 684, the Supreme Court, after approving the rule that damages are not rendered uncertain because they can not be calculated with absolute exactness, it being sufficient if a reasonable basis of computation is afforded, although the result be only approximate, said:

"Furthermore, a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible. Hetzel v. Baltimore & Ohio R. R. 169 U.S. 26, 39, 18 S.Ct. 255, 42 L.Ed. 648."

The plaintiffs' evidence in this action leaves no uncertainty or room for speculation as to either the existence, nature or proximate cause of damages. There is no doubt that the plaintiffs, as a result of the nuisance created by constantly spotting engines near the plaintiffs' house, have suffered additional damage over and above that attributable to ordinary and regular operation of engines in the switchyard. The fact that this additional damage is mingled with that caused by necessary and regular operations, while rendering fixation of the amount of additional damages difficult, does not bar recovery of an amount which, under the evidence, will furnish reasonable compensation to the plaintiffs for this additional damage. The only uncertainty in the evidence being as to the exact amount of damage, and this being a non-jury case, the amount to be awarded to the plaintiffs must be fixed by the court, exercising a sound discretion, at some figure which under all the evidence will

give the plaintiffs a fair and reasonable compensation for their injury. Considering all of the evidence, the court concludes that the sum of $250 per year, or $1,000 for the period of four years involved in this action, is fair and reasonable as compensation for damages to the plaintiffs in the circumstances of this case.

Conclusions of Law

1. This case does not fall under the general rule that the operation of a railroad in an ordinarily prudent manner, without negligence, does not, by reason of the attendant noise, smoke, or other objectionable features necessarily incident thereto, and which are common to the public at large, constitute an actionable nuisance.

2. The plaintiffs are entitled to judgment against the defendant for damages in the amount of $1,000. Costs are to be taxed against the defendant.