[No. 31979.   Department Two.   January 29, 1953.]

JOHN D. DUNSEATH, *Respondent*, v. WILBUR G. HALLAUER
*et al., Appellants.*[1]

[1]Reported in 253 P. (2d) 408.

*Max R. Nicolai,* for appellants.

*Edwards E. Merges* and *Howard P. Pruzan,* for respondent.

HILL, J.—Wilbur G. Hallauer and his wife agreed with John D. Dunseath and his wife to exchange properties, the exchange agreement being dated January 15, 1949.

The Hallauer property was a ranch of approximately one hundred fifty acres in Okanogan county about twelve miles from Omak. It included a fully equipped apple orchard (eighty acres of producing trees and eight acres of young trees, not yet producing), together with a cold storage warehouse on the railroad two miles from the ranch. This property was valued, for the purpose of the exchange, at $40,000, and was referred to throughout the trial and the findings as the "Malott Orchard."

The Dunseath property was a Seattle apartment house valued, for the purpose of the exchange, at $210,000. The Dunseaths were purchasing the apartment house on a contract on which there was $116,000 still due.

The difference between the value of the Dunseaths' equity in the apartment house and the value of the Hallauers' orchard was agreed to be $54,000, which was paid in cash by the Hallauers to the Dunseaths at the time of the closing of the transaction, March 1, 1949. On that date, also, the parties exchanged deeds and other documents of conveyance, the Hallauers took possession of the apartment house, and the Dunseaths took possession of the orchard property.

The winter of 1948-1949 was extremely cold in Okanogan county and throughout much of eastern Washington, and the prolonged low temperatures caused severe damage to fruit trees. Both parties were ignorant, on the date of the actual exchange, March 1, 1949, of the damage done to the Malott orchard, but during the spring and summer it developed that so many trees had been killed and severely damaged that it was impossible to continue the operation of the orchard as a commercially feasible venture.

Dunseath brought this action to recover damages, basing his claim upon a provision in the exchange agreement reading:

"Risk of damage to the respective properties prior to the closing of the deal is assumed by the seller of each of the properties, respectively."

Most suits involving liability for loss or damage occurring between the date of execution of a contract to convey real estate and the date of its performance involve injury or destruction of buildings by fire. However, illustrative of other types of damage which are sometimes involved, we find: dam carried away by freshet, *Green v. Kelly,* 20 N. J. L. 544 (1845); land washed away, *Neponsit Realty Co. v. Judge,* 106 Misc. 445, 176 N. Y. S. 133 (1919), and *Amundson v. Severson,* 41 S. D. 377, 170 N. W. 633 (1919); land destroyed by crevasses or inundation, *Ford v. Russell,* 13 La. App. 390, 128 So. 310 (1930); property ruined by vandals, *Coolidge & Sickler, Inc. v. Regn,* 7 N. J. 93, 80 A. (2d) 554 (1951); and hurricane damaged buildings and fences, *Gallicchio v. Jarzla,* 18 N. J. Super. 206, 86 A. (2d) 820 (1952).

The trial judge took the position that there had been no

depreciation in any of the nonorchard acreage, the buildings on the property, or the cold storage warehouse, as a result of the cold weather. He valued the producing orchard at $500 an acre and the young orchard at $250 an acre, or a total of $42,000, but found that the land containing only dead and commercially useless trees, which would have to be removed, had a value of only $150 an acre, making the value of the eighty-eight acres as of March 1, 1949, only $13,200. The difference, or total damage, was $28,800, of which he estimated that ten per cent had been done by January 15, 1949. Deducting that ten per cent as being apart from the damage the Hallauers assumed, he found the damage subsequent to January 15th and prior to March 1, 1949, to be $25,920, and gave Dunseath judgment in that amount.

The Hallauers appeal, making twenty assignments of error. These assignments are so grouped for argument that they actually urge three reasons why the respondent's cause of action should be dismissed and four reasons why the appellants are, in the event dismissal of the action is not ordered, entitled to a new trial.

■ Appellants first advance the proposition that the provisions of the exchange agreement dated January 15, 1949, were merged in the deed obtained by the respondent March 1, 1949; and where, they ask, "is there any provision in the deed between the parties in the instant case whereby respondent can hold appellants liable for the condition of the trees in March, 1949?"

One answer to this rhetorical question is that we cannot tell because the deed is not in evidence, this particular argument apparently being an afterthought on the part of the appellants. However, we answered a similar argument in *Davis v. Lee*, 52 Wash. 330, 100 Pac. 752 (1909), by recognizing the merger rule for which appellants contend and then pointing out that it has exceptions, one of which is that when there are stipulations in a contract for the sale of land of which the conveyance itself is not a performance, the question then becomes whether the parties intentionally surrendered those stipulations. We there quoted with ap-

proval from *Morris v. Whitcher*, 20 N. Y. 41 (1859), in part as follows:

" 'In absence of all proof there is no presumption that either party, in giving or accepting a conveyance, intends to give up the benefit of covenants of which the conveyance is not a performance or satisfaction.' "

We find this exception to the merger rule well stated in an annotation in 84 A. L. R. 1008, 1018:

"Where a contract for the sale of land embraces stipulations other than those relating to the conveyance of the subject-matter, and imposes upon the vendor the duty of performing acts other than those required to assure to the vendee the character of title stipulated for, the contract is something more than one for the mere conveyance of the subject-matter at a designated time, hence the execution and delivery of the deed of the land is merely the performance of the provisions relative to transfer of the title. It is one of several executory acts stipulated for, therefore its performance does not affect the vitality of the original contract as to collateral matters which the vendor has obligated himself to perform. Accordingly, where there are collateral undertakings expressed in such a contract which are not satisfied by a subsequently executed deed of the subject-matter, these undertakings survive the acceptance of the deed, unless there are provisions in the deed inconsistent with the survival of such covenants or stipulations."

See, also, *Green v. Kelly, supra.*

We therefore hold that the collateral undertaking whereby the owners agreed to assume risk of loss until the deal was closed was not satisfied by the subsequently executed deeds and was not merged in but survives the execution of the deeds.

Appellants next assert that, since the trees constituted a large part of the consideration which Dunseath was to receive, he could have rescinded the agreement immediately upon discovery of the damage but was not entitled to keep the property and maintain an action for damages. (Parenthetically, it may be said that this is a distinct departure from appellants' position at the trial, where their efforts were directed toward minimizing the value of the

orchard because of its age, the unprofitable varieties, and its location in a "cold pocket." Hallauer himself testified on several occasions that the property was worth as much after the cold winter as it was before, and that its value was depreciated only to the cost of the removal of the trees.)

This argument by appellants' counsel, who did not represent them at the trial, is based in part on an assumption that we are not prepared to make as to the reason for the inclusion of the assumption-of-risk clause in the exchange agreement. We think that this is a particularly appropriate provision for an exchange agreement, and that it means exactly what it says. Abatement of a portion of the purchase price in the event of damage to one of the properties is not an available remedy on an exchange of property, as it might be in the usual contract for sale of real estate. The parties contracted to assume the risk of damage of their respective properties prior to the date of closing, which they had a right to do, and we do not see what clearer language they could have used to express their intention.

There are, in any event, factors here which distinguish the present case from those relied upon by the appellants: First, the contract had been executed and the deeds exchanged, and the parties had gone into possession of the properties conveyed to them and several months elapsed before the fact of damage and the extent of it could be established; second, while it is true that the parties did not anticipate that the winter damage would be as extensive as it proved to be, winter damage is one of the more common risks of the fruit grower and must be regarded as one of the risks of damage concerning which the parties were contracting, and it was so found by the trial court.

*Green v. Kelly, supra,* involved an agreement for the sale of a sawmill property containing a provision by which the owner agreed to deliver possession of the premises in as good repair as they then were, natural and reasonable wear and tear excepted. Between then and the date agreed upon for conveyance of the property, a freshet carried out sixty feet of the dam erected to supply the mill with water. On

the day provided for in the agreement, the purchase price was paid and a deed and possession of the premises were delivered to the purchaser. The purchaser then brought an action for damages for breach of the agreement to deliver the premises in as good condition as they were when the agreement was made. The court overruled a demurrer, saying:

"Again—it is said, that whatever the agreement of the parties was, it was completed by the payment of the purchase money and delivery of the deed and possession. That the plaintiff, by accepting the deed and possession, has discharged the defendant from all claim, for damages under the contract. This is not the rule of law. The plaintiff, by accepting the deed and possession, did not waive his right to damages for the dilapidated condition of the property, at the time possession was taken. He had a right to accept the deed and possession, reserving to himself his claim for damages under the agreement. Such was the opinion of this court in this case, reported in 3 *Har.* 246. The language of the court is 'if the defendant has given a deed and delivered possession, but not in as good repair &c., then the plaintiff should assign as a breach, that the defendant had not delivered possession of the premises in as good repair as the same were when the agreement was made, and show wherein the difference consists.' . . .

"It should be borne in mind, that the agreement was to be executed by payment of the purchase money and delivery of the deed and possession of the premises, at a future day; and until then the defendant was to retain the possession. There is nothing in the agreement from which it can be inferred, that the sum the plaintiff agreed to pay was not a full and fair price for the property in the condition it was at the date of the contract. It would be unreasonable to suppose, that the plaintiff would covenant to pay a full price for the property at a future day, and in the mean time run the hazard of its destruction by the elements, or of its being improperly used while in the possession of the defendant."

We are of the opinion that the respondent here was under no obligation to rescind, but was entitled to bring his action upon the assumption-of-risk clause in the exchange agreement.

■■ Appellants' next attack is upon the evidence as to the extent of the damage, and their position is that there

can be no certainty as to what damage occurred before January 15, 1949, and what occurred after that date; hence, any estimate as to respondent's damage must be dependent upon guess, surmise, conjecture and speculation.

With this we cannot agree. The uncertainty here is not as to the fact of damage, which would be fatal to a recovery by a plaintiff, but as to the amount of the total damage that occurred after January 15th. We find ample support for the findings of the trial court that the orchard had, prior to January 15, 1949, suffered some minor winter damage due to the periods of cold weather prior to that date, but that it was the extended and continuous period of extremely cold weather from the middle of January to the middle of February that "resulted in the fatal damage to the Malott Orchards." That finding being supported by competent evidence, Dunseath was entitled to recover from the appellants even though a minor part of the total damage did occur prior to January 15th.

The difficulty of ascertainment of the amount of damage is not to be confused with the right of recovery. *Park v. Northport Smelting & Refining Co.*, 47 Wash. 597, 92 Pac. 442 (1907); *Ball v. Stokely Foods*, 37 Wn. (2d) 79, 221 P. (2d) 832 (1950); *Pillois v. Billingsley*, 179 F. (2d) 205 (1950). The rule is that, if a plaintiff has produced the best evidence available and if it is sufficient to afford a reasonable basis for estimating his loss, he is not to be denied a substantial recovery because the amount of the damage is incapable of exact ascertainment. *Ball v. Stokely Foods*, *supra*; *Monroe v. Owens*, 76 Cal. App. (2d) 23, 172 P. (2d) 110 (1946); *Stott v. Johnston*, 36 Cal. (2d) 864, 229 P. (2d) 348 (1951); *Shannon v. Shaffer Oil & Refining Co.*, 51 F. (2d) 878, 78 A. L. R. 851 (1931); *Kimball v. Thompson*, 70 F. Supp. 803 (1947); *General Finance Corp. v. Dillon*, 172 F. (2d) 924 (1949). This rule was stated and applied under somewhat unusual and difficult circumstances in *Kimball v. Thompson*, *supra*, where the court said:

"The plaintiffs' evidence in this action leaves no uncertainty or room for speculation as to either the existence, nature or proximate cause of damages. There is no doubt

that the plaintiffs, as a result of the nuisance created by constantly spotting engines near the plaintiffs' house, have suffered additional damage over and above that attributable to ordinary and regular operation of engines in the switchyard. The fact that this additional damage is mingled with that caused by necessary and regular operations, while rendering fixation of the amount of additional damages difficult, does not bar recovery of an amount which, under the evidence, will furnish reasonable compensation to the plaintiffs for this additional damage. The only uncertainty in the evidence being as to the exact amount of damage, and this being a non-jury case, the amount to be awarded to the plaintiffs must be fixed by the court, exercising a sound discretion, at some figure which under all the evidence will give the plaintiffs a fair and reasonable compensation for their injury."

And where some damage occurred before a certain date and some after that date (as frequently happens when the statute of limitations is involved), the trial court faces the same kind of a problem in determining what damages occurred within a specified period of time—a difficult problem, incapable of exact determination, but not impossible of a reasonable solution. *Park v. Northport Smelting & Refining Co., supra; Riblet v. Spokane-Portland Cement Co., ante,* p. 249, 248 P. (2d) 380 (1952).

We are satisfied that both the fact of damage subsequent to January 15th and prior to March 1st and the amount thereof were established in this case with sufficient certainty.

Being satisfied that there is no reason to reverse the judgment and dismiss the complaint, we turn now to a consideration of the reasons urged by the appellants as to why they should have a new trial.

They urge that the wrong measure of damage was applied and that, in an action on contract, in the absence of fraud or bad faith the respondent is not entitled to recover damages for loss of the benefit of his bargain.

We are here concerned with an express agreement to assume the risk of damage "prior to the closing of the deal." Whatever the measure of damage applied may be called,

the respondent is as much entitled to be compensated for the damage which the orchard property sustained through the excessive and continuous cold weather subsequent to January 15, 1949, and prior to March 1, 1949, as he would be had one or all of the buildings on the property been destroyed by fire during the same period.

Appellants argue that because one witness testified that only seventy-five to eighty-five per cent of the trees were killed, respondent was not entitled to damages for the destruction of the entire orchard.

■ The measure of damages in any particular case will depend upon the facts in that case. We are not here concerned with trees that have value because of the lumber that can be secured from them; the damage here was the loss of a producing commercial orchard, and, under the evidence, the orchard was a total loss even though a few trees might be capable of producing fruit. The appellants nowhere suggest (and in the light of the evidence the reason is obvious) that the trial court should have determined the replacement cost of a producing orchard as a measure of damage.

It seems to us that the amount of the loss in this case is fairly measured by the standard applied by the trial court, *i.e.*, the difference between the value of the eighty acres of producing trees and eight acres of young trees and the value of that acreage after the orchard had been destroyed and with the dead and commercially useless trees on it. Any depreciation in the value of the packing plant (which was part of the producing orchard property) as a consequence of the destruction of the orchard was not taken into consideration. From our point of view, there was no error in the measure of the respondent's loss as applied by the trial court of which the appellants could justifiably complain.

■ It is claimed that the trial court erred in admitting exhibit No. 15, purporting to be a chart of temperatures for the period from November 1, 1948, to February 29, 1949, for Wenatchee, Omak, and Yakima, prepared from the offi-

cial government weather reports for the latter two cities and from the records of the Washington state college tree experiment station in Wenatchee.

Appellants are hypertechnical in that they object to this exhibit because it does not show the temperatures at the particular orchard involved in this suit; it is not to be expected that there would be a recording thermometer in every orchard. At no time was the accuracy of the exhibit questioned, and it seems to represent the temperatures in that area as closely as they could be determined. The distance of the Malott orchard from the weather station in Omak where temperature recordings were taken, and differences in altitude, humidity, and other factors that would account for variance in temperatures might have been shown as affecting the reliability of the exhibit as an indication of the temperatures in the Malott orchard, but those matters would go to the weight to be attached to the exhibit and not to its admissibility.

Appellants complain that the trial judge attached too much weight to the temperatures shown on this exhibit, because he based some of his findings on them.

This seems to go from the hypertechnical to the super-hypertechnical, in view of the fact that appellants used the identical exhibit in examining their own horticulturist, Donald R. Bartram, as a basis for his testimony, and in view of the pages of testimony they introduced to establish that this property, being along the river, was colder than higher properties on the "bench," and that there were "frost pockets," making some portions of the property colder than others. Their purpose seemed to be to establish that this was not a good orchard location because it was more susceptible to cold than the surrounding area.

There is no semblance of merit in appellants' assignment of error relative to the admission of exhibit No. 15 and its use by the trial judge as the basis of some of his findings.

It is also urged that the parol evidence rule was violated when evidence was received showing that the actual value of the orchard property was $80,000 and the value of the

apartment house $250,000, and that the lower figures of $40,000 and $210,000 were used in the exchange agreement, at Hallauer's suggestion, in order to reduce the amounts subject to income taxes.

We do not believe that the admission of that evidence was error, as we have consistently held that parol evidence is admissible to show the true consideration of a written agreement. See *Zackovich v. Jasmont*, 32 Wn. (2d) 73, 200 P. (2d) 742 (1948), and cases there cited. In any event, it was not prejudicial, as the trial court fixed damages not on the valuation of the entire property but on the depreciation in market value of the actual orchard acreage between January 15th and March 1, 1949.

Finally, appellants claim that they were entitled to a new trial because the judgment was unjustly high, and again we disagree with them. The evidence would justify a substantially higher figure as to the value per acre prior to the winter damage and a substantially lower figure per acre value subsequent thereto. In our opinion, if the trial court erred at all it was in finding that ten per cent (which seems high to us) of the total damage occurred before January 15, 1949, and in failing to take into account the depreciated value of the packing plant. Neither was prejudicial to the appellants.

The appellants have established no reason for either dismissing the action or granting them a new trial, and the judgment is affirmed.

SCHWELLENBACH, HAMLEY, FINLEY, and OLSON, JJ., concur.