[No. 34363. Department Two. July 31, 1958.]

SNOWFLAKE LAUNDRY CO., *Respondent*, v. HUGH T. MAC-DOWELL *et al.*, *Appellants*.[1]

[1]Reported in 328 P. (2d) 684.

*Devin, Hutchinson & Rolfe*, for appellants.

*Elliott, Lee, Carney & Thomas*, for respondent.

WEAVER, J.—Defendants New Model Laundry, Inc., a corporation, and Hugh T. MacDowell appeal from a $9,140.30 money judgment entered in favor of plaintiff Snowflake Laundry Co., a corporation.

In addition to the corporate parties, five individuals play important roles in a complicated factual pattern. They are: Frank T. Smith, president and principal stockholder of Snowflake; Edward Urich; Hayden F. Callaham; A. D. Tomlinson, president and principal stockholder of New Model; and Hugh T. MacDowell, son-in-law of Mr. Tomlinson.

Considering the length of the record and the findings of fact entered by the trial court (twenty-two pages), appellants' assignments of error directed to the findings are minimal. Rather than extend this opinion by a discussion of each, we conclude that there is evidence in the record to support the following facts:

For a number of years, Snowflake has been engaged in a diversified laundry and dry cleaning business in the Seattle area. Prior to 1945, Snowflake serviced the laundry needs of certain summer residents of Bainbridge island by employing hired drivers or route men, who would go back and forth to the island by ferry once or twice a week during the summer period.

Prior to 1945, Edward Urich had developed and owned an independent laundry and dry cleaning business on the island, known as a commission route.

In September, 1945, Mr. Urich, as an "independent contractor" and owner of the laundry service we have just described, entered into a written contract with Snowflake.

The contract provided:

"The second party [Urich] agrees that he will employ the First Party [Snowflake] *to perform all laundry and dry cleaning which he* [Urich]*shall secure in the course of his business, . . .*" (Italics ours.)

which, of course, included the customers formerly served by the Snowflake drivers.

In return, Snowflake agreed to: furnish laundry lists and route sheets, do the laundry and dry cleaning work for sixty-five per cent of the current standard rate, open ledger accounts, and send monthly bills. The agreement was to continue for three years and, thereafter, until terminated by either party on ninety day's written notice.

About September 1, 1951, Mr. Urich desired to sell his business to Hayden F. Callaham, who had been employed by Mr. Urich since 1948.

The trial court found (and no assignment of error is directed to the finding) that

"There had long been a union custom or rule or regulation which was apparently not in writing or a part of the regular union contracts . . . to the effect that whenever a commission driver wishes to sell his business *he would give first refusal* to the laundry to which he was currently taking his work." (Italics ours.)

Mr. Urich discussed the contemplated sale to Mr. Callaham with Mr. Smith, president of Snowflake, and gained his consent. As a result, September 1, 1951, Snowflake and Mr. Callaham entered into a written agreement that was substantially the same as the 1945 contract Snowflake had with Mr. Urich. For the duration of the contract, or until September, 1954, Mr. Callaham was required to employ Snowflake "to perform all laundry and dry cleaning which he shall secure in the course of his business."

We turn now to New Model's business on Bainbridge island. Sometime prior to 1945, New Model had developed a laundry route on the island. It was uneconomical to operate. In 1949, after Mr. Urich had obtained the consent of Snowflake, New Model arranged with him to service its business on a commission basis.

September 1, 1951, Mr. Callaham entered into a written contract with New Model. In the contract that continued in force for one year and, thereafter, until cancelled, New Model agreed "to *loan* all of the accounts of the New Model Laundry, Inc., located on Bainbridge Island" to Mr. Callaham and to permit him to use New Model's good will, in so far as it pertained to the island. He agreed to maintain and preserve the "average dollar volume of business *borrowed* from the New Model Laundry Inc." and "to return . . . all accounts borrowed or their equivalent upon receipt of proper notice." The contract contained a penalty clause if New Model's business declined and provided for a bonus if it increased.

In his oral decision, the trial judge aptly pointed out the divergent theories the two laundries used in doing business on Bainbridge island. He said:

"The New Model people and the Snowflake people had different concepts of the way that business should be handled. It was Mr. Smith's [president of Snowflake] view that the Island was pretty much of an entity; that the customers living there would be best satisfied if they could deal with a local man whom they knew, in whom they had confidence, and so it was his thought to enter into a contract with an independent business on the Island, . . . It, according to the wording of the contract, had no customers on the Island.

" . . .

"The New Model concept was to retain as its own the good will of the customers which it had and not to deal with the Island service man as an independent contractor. He was expressly designated as an agent of New Model, at least he was so held out to the public.

" . . . there was room for New Model only to hang on to such existing customers as it could, one would expect that at best New Model business would remain a—relatively consistent—and due to normal changeovers, changes of residence, deaths, and various natural causes, the chances are New Model business would drop and that's what happened, and New Model invoked the penalty clause in its contract with Urich."

In June, 1954, Mr. Callaham decided to sell his Bainbridge island business. Following the custom already described, Mr. Callaham communicated his decision to Mr. Smith of Snowflake, who expressed a preference that a resident of the island purchase the business. He agreed to co-operate with Mr. Callaham in an endeavor to find a purchaser.

Some weeks thereafter, Mr. Tomlinson, president of New Model, negotiated the purchase of Mr. Callaham's business, but did not tell him who the purchaser was until they had substantially agreed upon the details and terms of the purchase. The purchase was subsequently made in the name of the defendant Hugh T. MacDowell, son-in-law of Mr. Tomlinson.

Mr. Tomlinson telephoned Mr. Smith at Snowflake and

asked if he had any interest in purchasing Mr. Callaham's business or in purchasing it jointly. Mr. Smith told him that he did not wish to purchase or put any money in it for the reason that, in his opinion, an island resident should own and operate the business.

Although it is assigned as error, we find the record supports the trial court's finding that

"Smith advised Tomlinson he would not object to a contract with MacDowell being substituted *if MacDowell would agree to carry out the same contract that Callaham had with Snowflake,* to which Tomlinson replied by assuring Smith that MacDowell would operate in the same manner that Callaham had operated and would stand by such arrangements." (Italics ours.)

October 1, 1954, Mr. Callaham sold his business to Mr. MacDowell. The contract was prepared by the lawyer for New Model; it was signed in the New Model office; it contained three changes, all initialed by the parties and by Mr. Tomlinson, president of New Model. The four-thousand-dollar down payment was paid by New Model and charged to Mr. MacDowell on its books. The contract expressly recognized that certain of the laundry accounts, serviced by Mr. Callaham as lessee, were actually owned by New Model. The balance of the "laundry business" (exclusive of trucks) was valued at $2,837 for the purpose of the sale.

One of the circumstances that supports the trial court's finding that Mr. Smith told Mr. Tomlinson he had no objection to a contract with Mr. MacDowell being substituted, if Mr. MacDowell would agree to carry out the same contract that Mr. Callaham had with Snowflake, is the fact that Mr. MacDowell entered into a contract with Snowflake on October 6, 1954, that provided:

"The Second Party [Mr. MacDowell] agrees that he will employ the First Party [Snowflake] to perform all laundry and dry cleaning which he shall secure in the course of his business, except that *it is understood and agreed that the predecessor of the Second Party* [Mr. MacDowell] *has been handling laundry for certain customers of the New Model Laundry and that the Second Party* [Mr. MacDowell] *is*

*to be permitted to continue the handling of the laundry of such customers for said New Model Laundry."* (Italics ours.)

This contract, which was to continue for three years and thereafter until terminated by either party on ninety days' written notice, is substantially the same as Snowflake's prior contracts with Mr. Urich and Mr. Callaham.

Again, we find that there is evidence in the record to support the trial court's finding:

"That Tomlinson [New Model] either was, or had an opportunity to be, fully familiar with all of the arrangements between Callaham and Snowflake, and with the terms of MacDowell's contract with Snowflake."

At this point, the *modus operandi* of the laundry business on Bainbridge island underwent a radical change.

Mr. Tomlinson, acting in the name of New Model, invested more than $32,000 for the purchase of real estate, improvements and buildings near the ferry terminal on the island. The building contained living quarters for Mr. Mac-Dowell and his family and space for receipt, sorting, and storage of laundry and dry cleaning. New Model paid for a neon sign that advertised the business as New Model Launderers and Cleaners. Mr. MacDowell obtained uniforms bearing New Model insignias; he entered into contracts for telephone and advertising services that differed from those used by his predecessors. With funds furnished by New Model, he purchased new trucks and delivery equipment upon which he advertised New Model and its Seattle plant telephone number. All of this led the trial court to find that

". . . instead of the business being operated by Mac-Dowell as an individual home-owner of a Bainbridge Island laundry service, it was conducted largely in the name of New Model."

The trial court further found:

"That all of these things were done with the knowledge, consent and approval of Tomlinson, acting on behalf of New Model, for the obvious purpose of taking over, as far as pos-

sible, all of the laundry and dry cleaning business on Bainbridge Island in the name of New Model."

Mr. MacDowell at once began diverting laundry from the cash customers of Snowflake to New Model. Although the findings of fact contain a detailed description of Mr. MacDowell's method of operation between October 1, 1954, the date the business was purchased, and March 23, 1955, we do not find it necessary to set it forth. It is sufficient to point out that during this period, Snowflake, with good cause, first became suspicious and, after investigation, convinced that Mr. MacDowell was not living up to the terms of his contract to employ Snowflake to perform all laundry and dry cleaning secured in the course of his business, except that business secured from the New Model accounts on "loan" to him. Without notice to Mr. MacDowell or New Model, Snowflake prepared to establish its own laundry route on the island and, in doing so, spent considerable money, a fact to which we will allude later in this opinion.

Prior to March 23, 1955, Mr. MacDowell learned of Snowflake's investigation and preparation to establish a competing laundry route on the island. On that day, he delivered written notice (prepared with the assistance of New Model's comptroller) to Mr. Smith of Snowflake that he (MacDowell) would "no longer bring my work into your plant for processing." Thereafter, Mr. MacDowell took all of the island laundry and dry cleaning business collected by him and his employees to the New Model plant. Snowflake, through Mr. MacDowell, was furnishing marked and embossed garments to commercial and industrial customers. Mr. MacDowell's delivery of all business to the New Model rendered these garments obsolete, to Snowflake's damage in the sum of one hundred dollars.

The parties stipulated, and the trial court found, that five per cent of the gross-dollar volume of the laundry and dry cleaning business is a reasonable profit to be anticipated by either Snowflake or New Model; and that this percentage may be used as a formula to compute loss or gain of profits, in so far as any increase or decrease of volume of business is involved in this case.

Finally, the trial court found that the telephone number, contracted by Mr. Callaham in the name of Snowflake, had been transferred from the Callaham premises to the premises of New Model.

The trial court concluded: (a) that it was the intention and purpose of Mr. Tomlinson, acting in behalf of New Model, to acquire Snowflake's business on Bainbridge island, which resulted in the unjust enrichment of New Model; (b) that the relationship of principal and agent, as their actions affected Snowflake, existed between New Model and Mr. MacDowell and that New Model, by virtue of this relationship, became a party to Mr. MacDowell's contract with Snowflake, which was breached by them; (c) that Snowflake was justified in attempting to mitigate its damages and regain its business by employing a route man.

April 12, 1957, the court entered judgment in Snowflake's favor as follows:

(a) Against New Model Laundry, Inc., and Hugh T. Mac-Dowell for $8,998.26. This sum consists of (1) $5,342.47, which is five per cent of the laundry and dry cleaning business the court determined Snowflake would have received had the events we have delineated not taken place; (2) $100, Snowflake's loss by reason of the garments becoming obsolete; and (3) $3,555.79, the loss allegedly suffered by Snowflake in an attempt to mitigate its damages;

(b) Against Hugh T. MacDowell for $142.04 for the processing of garments brought to Snowflake by Mr. MacDowell; and

(c) Prohibiting defendants the use of the telephone number formerly used by Snowflake.

At different times during the course of a protracted trial, this action has been variously described as (a) an action for rescission of contract, (b) an action for damages for breach of contract, and (c) an action based upon quasi contract, restitution, and unjust enrichment.

■ We do not agree with defendants' argument that Snowflake elected to rescind the contract when it notified laundry users on Bainbridge island that it no longer had a

contract with Mr. MacDowell, and when it hired a driver to compete with Mr. MacDowell for the island business. This is not evidence of rescission; it is an attempt by Snowflake to regain that which it deemed had been taken from it by the alleged breach of the contract signed by Mr. MacDowell.

"A mere expression by the injured party of recognition of the fact that a vital breach has occurred and an assertion of his own discharge thereby is no part of an 'agreement to rescind'; it is not an offer to rescind, nor is it the acceptance of such an offer. Furthermore, it is not an 'election' between remedies, the very existence and character of which he can not know until advised by a competent lawyer.

"When the injured party asserts his own freedom from the duty to perform further, he is merely trying to avoid further loss from the other's wrong—something that the law often requires of him whether he is willing or not. There are other methods by which he may reasonably endeavor to avoid or reduce injury; he may contract for some substitute material or service; . . . In doing these things, he is trying to avoid harms and losses; he is not offering a 'rescission' or 'waiving' his rights or 'electing' a remedy." 5 Corbin on Contracts, § 1237, pp. 962, 963.

■ Further, in answer to defendants' argument that the plaintiff had elected to rescind the MacDowell contract and that such election precluded any recovery of damages for breach, the trial court said:

"The complaint alleges facts which would support *both* an action for rescission and one for damages for breach of contract, and the prayer expressly asks judgment that said contract is 'fully rescinded and void . . . and in addition thereto judgment for damages . . . [for] breach of said contract . . .' This is no election. Plaintiff has simply alleged two remedies and has claimed both. If defendants thought the remedies inconsistent, they should have moved that plaintiff be required to elect. The law gives them no right to make the election in behalf of plaintiff. *Not having pursued the appropriate course,* defendants may not justly object to the plaintiff's right to any relief within the scope of the pleadings and evidence. Cf. 18 Am. Jur. 132 et seq., Election of Remedies, §§ 9, 10 and 16." (Italics ours.)

In the final analysis, the trial court treated this as an action for damages for breach of contract. The court having announced its decision, counsel for defendants inquired:

"Is the basis of liability here, so that I may understand this, that New Model in effect is a principal on this contract; that there was a total breach of the contract by both New Model and MacDowell, therefore, New Model and MacDowell are both liable in these damages?"

The court replied:

"Yes. I would say that so far as the third parties are concerned, not as between MacDowell and New Model necessarily, but as to the parties such as the Snowflake, there was, I think, a master and servant relationship, or a principal and agent relationship, and that any party injured by the act of the servant or agent can look to the principal or master, and I think that is what, in effect, it was."

Having satisfied ourselves that the theory adopted by the trial court is within the scope of the pleadings and the evidence, it is unnecessary for us to consider whether this is an action based upon quasi contract, restitution, and unjust enrichment.

We find no merit in defendants' assignments of error directed to the conclusion of law

"That because of the conduct and method of operations of the defendants, New Model and MacDowell, there arose prior to October 1, 1954, and continued after said date the relationship of principal and agent between them, at least in respect of Snowflake Laundry and the business it derived and should have derived through MacDowell from Bainbridge Island."
and

"That New Model by virtue of its relationship with MacDowell of principal and agent became a party to MacDowell's contract with Snowflake (Plaintiff's Exhibit 2) to the same extent as if it had signed such contract."

The trial court aptly remarked:

"It is said that there is a contract between MacDowell and New Model. If so, where is the contract and what does it say? The evidence here indicates that there isn't any contract. . . . There is not the slightest suggestion that

Mr. MacDowell exercised any independent judgment in here anywhere."

 Our disposition of this point is governed by the *rationale* of our decision in *Turnbull v. Shelton*, 47 Wn. (2d) 70, 72, 286 P. (2d) 676 (1955), wherein the court said:

"An implied agency is an actual agency and can be proved from facts and circumstances by deduction or inference; it is established by the words and conduct of the parties and by the circumstances of the particular case. [Citing cases.]

"In *Coombs v. R. D. Bodle Co.* (1949) 33 Wn. (2d) 280, 285, 205 P. (2d) 888, we quoted the following definition of 'agency' from 1 Restatement, Agency 7, § 1 (1):

" 'Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.' "

██ New Model's activities and investment in the Bainbridge island laundry business are inconsistent with any claim that Mr. MacDowell was an independent contractor in his relationship with Snowflake. There is evidence to support the trial court's decision that New Model was the principal in the transaction. See *Freeman v. Navarre*, 47 Wn. (2d) 760, 767, 289 P. (2d) 1015 (1955), and cases cited.

It would add nothing to the decisional law of this jurisdiction to detail the method of accounting adopted by the trial court when it determined the gross-dollar volume of laundry business Snowflake would have received from Bainbridge island during the next three years had the contract of October 6, 1954, signed by Mr. MacDowell, not been breached. The parties having stipulated that five per cent of gross-dollar volume is a reasonable profit to be anticipated, the court did not err when it fixed Snowflake's damages resulting from loss of business at $5,342.47.

This case presents a unique question in the law of mitigation of damages. Instead of defendants arguing that plaintiff's damages should be reduced because plaintiff should have mitigated its damages, plaintiff urges, and the trial court held, that plaintiff is entitled to the $3,555.79 it expended in an alleged attempt to "mitigate its damages." It

is not necessary that we set forth the formula by which the amount was determined, for we conclude that plaintiff is not entitled to recover this amount spent in establishing and continuing its own laundry route on Bainbridge island.

One who has sustained damage, by reason of the act of another, must use reasonable efforts to minimize his damages. *Sullivan v. Boeing Aircraft Co.*, 29 Wn. (2d) 397, 405, 187 P. (2d) 312, 174 A. L. R. 566 (1947), and cases cited; *Westland Constr. Co., Inc. v. Chris Berg, Inc.*, 35 Wn. (2d) 824, 837, 215 P. (2d) 683 (1950).

Mitigation of damages is what the expression imports, a reduction of their amount, the result of facts that show the plaintiff's cause of action does not entitle him to as large an amount as the proof would otherwise justify that the trier of facts allow. 1 Sutherland, Damages (4th ed.) 459. The whole concept turns on the idea that a damaged party should pursue a course, after a breach, which is designed to assist the party in breach. This does not, however, prevent the injured party from incurring chargeable expense in his effort to mitigate damages.

"Usually a recovery may be had in such cases though such efforts were unsuccessful or, in certain instances, though a mistake was made, provided the injured party acted in good faith in making such efforts and upon a reasonable belief that they would be successful. But while an expenditure, to be chargeable against the defendant, need not have actually inured to his benefit, *it must have been incurred in an effort to accomplish a result that would have that effect.* Hence, where the defendant's liability for damages is limited to a specified amount, the expenditure must have been made in the reasonable expectation that it would reduce the recoverable damages below that amount." 15 Am. Jur., Damages, § 147, p. 555. (Italics ours.)

The rule is well stated in Mayne on Damages (11th ed.); p. 151:

"The object of allowing evidence in mitigation of damages is to arrive at the . . . actual damage resulting directly from the defendant's act . . . Matter completely collateral, and merely *res inter alios acta*, [transactions between others] cannot be used in mitigation of damages."

As the trial court remarked and as we have noted previously, plaintiff "had no customers on the Island." It had a contract to have laundry and dry cleaning delivered to it for three years. At the end of that period, one of three situations would have developed: (1) The contract would be renewed; (2) the contract would not be renewed and Mr. MacDowell would be free to have the laundry work done wherever he pleased; or (3) Snowflake would have the first option to purchase the business should the owner desire to sell. The first possibility adds nothing to the solution of the problem. Should either the second or third possibility occur, and Snowflake desire to continue business on Bainbridge island, it would either (a) have to pay Mr. MacDowell for the business or (b) spend money in establishing its own laundry routes on the island.

When plaintiff is awarded damages for breach of the contract (as the trial court held), it receives everything to which it is entitled. The expense of establishing its own laundry routes on the island cannot be said to be in mitigation of damages; it was a "transaction between others." Hence, it was error to allow plaintiff judgment for $3,555.79 for alleged mitigation of damages.

The judgment against "the defendants Hugh T. MacDowell and New Model Laundry, Inc., a corporation, and each of them, in the sum of $8,998.26" is reduced to $5,442.47, in all other respects, the judgment is affirmed.

Each party shall bear his own costs on appeal, except that appellants shall recover from respondent one half of the cost of the statement of facts (804 pages), the transcript (124 pages), and the supplemental transcript (20 pages). Rule on Appeal 55 (1), 34A Wn. (2d) 58, as amended, effective June 15, 1956.

HILL, C. J., DONWORTH, ROSELLINI, and FOSTER, JJ., concur.

---

September 26, 1958. Petition for rehearing denied.