[No. 36863.   Department One.   March 26, 1964.]

HAROLD LARSEN et al., Respondents, v. WALTON PLYWOOD
COMPANY et al., Appellants, WASHINGTON PLYWOOD
COMPANY, INC., Respondent.*

*Reported in 390 P. (2d) 677.

*Schweppe, Reiter, Doolittle & Krug, Thomas R. Beierle, Cooper & Cooper,* and *Leslie R. Cooper,* for appellants.

*Lenihan & Ivers, Emmett G. Lenihan,* and *James F. Mc-Ateer,* for respondents.

DAWSON, J.†—Harold Larsen, William Nolan and Fred V. Ness, minority stockholders of Washington Plywood Company, Inc., designated herein as Washington, brought a derivative action for breach of contract against Washington,[1] and against the partners of Walton Plywood Company, a limited partnership, designated herein as Walton, and against Richard E. Walton and J. H. Fletcher[2] in their individual capacity. Walton cross-claimed, seeking foreclosure of mortgages given to secure payment of certain promissory notes executed by Washington as maker. After 33 days of trial, heard by the court sitting without a jury, the issues were resolved by the trial court as follows: judgment to

†Judge Dawson is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

[1]Washington subsequently, as cross-defendant, adopted the original complaint and prayer.

[2]Also members of the limited partnership.

be granted in favor of Washington (omitting items not embraced on appeal) (1) in the sum of $322,004.51 for breach of paragraph 13A of an option agreement; (2) in the sum of $3,500,000 for breach of a sales contract; (3) in the sum of $1,348.05 for costs; and to be credited to Walton as an offset, the unpaid balance of principal and interest on the promissory notes held by Walton in the amount of $942,391.75 in full satisfaction of said notes and mortgages securing the same. As additional relief, the sales contract was to be cancelled. From judgment entered and so based, the defendants appeal.

Appellants assign error to 24 findings of fact and to 16 conclusions of law. They suggest that simple questions of contract law are involved on this appeal. Respondents suggest that the appeal is merely an effort to retry issues of fact and that *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn. (2d) 570, 343 P. (2d) 183, is a complete answer. Due to the exigency of circumstances, both would dispatch us in a necessary consideration of briefs of more than 550 printed pages and statement of facts in excess of 5,500 pages. To conform, we must confine. Thus, we disregard assignments we consider without merit, and we offer a basis for a timely resolution of the issues.

Prefatorily, we historize the relationship of the parties. Richard E. Walton had been engaged in the manufacture of plywood in Everett since the year 1924.[3] During the year 1955, although the business had paid them substantial salaries and had realized a profit, both Mr. Walton and Mr. Fletcher deemed it advantageous to sell the plant and business to a worker-owned corporation, and retain an exclusive selling agency for its output. They became the promoters of Washington, selected its first board, caused all

[3]From 1943 through 1946, the vehicle was Walton Plywood Company, a partnership. From 1947 to May 1, 1952, operation was through a division of Walton Lumber Company, and from May 1, 1952, until Washington took over the operation on November 1, 1955, the vehicle was Walton Plywood Company, Inc., its stock ownership being as follows: 40 per cent in Richard E. Walton, 35 per cent in J. H. Fletcher, his brother-in-law and associate of long standing, and 25 per cent in H. R. Secoy.

necessary papers and legal documents to be drawn, and selected A. W. Braedt as optionee. As their employee, Mr. Braedt was in charge of receiving stock subscriptions for 300 shares of corporate stock of Washington at $5,000 per share. He received from Walton a salary and one share of stock for his services, and became Washington's first manager. After Washington was activated, the option agreement was assigned to it and was exercised. The Walton Plywood plant[4] was purchased for $1,500,000, and its inventory for $800,000. The sum of $1,300,000 was paid in cash from the capital derived from stock sales. Promissory notes issued for the balance payable in monthly installments. These were secured by mortgages.

Thus Washington began its perilous voyage with operating capital in the approximate amount of $150,000. This was inadequate, for its losses exceeded $181,000 during its initial 6 months of operation. The accumulation of causes will hereinafter appear.[5]

We will consider in order the following components of the judgment: (1) $322,004.51; (2) $3,500,000. (1) Involves a construction of paragraph 13 of an option agreement.[6]

[4]It had cost $550,000 and had a depreciated value of $293,000.

[5]Although Mr. Walton and Mr. Fletcher had fiduciary duties as promoters of Washington, and Mr. Walton assumed added ones when he became an officer of Washington, the trial court did not scrutinize, nor measure good faith or inherent fairness, nor base its judgment on this factor. Nor do we.

[6]Paragraph 13 reads:

"13. LOGS AND TIMBER.

"A. As further consideration for the purchase price set forth in paragraph 4 above, Optionors agree that, in the event Optionee or his Nominee exercises this option, Optionors coincident with the closing transaction, will organize and finance a timber company, either corporate or unincorporated, with funds aggregating not less than Five Hundred Thousand ($500,000) Dollars available for purchase and logging of timber and timberlands; will use their best efforts to acquire and offer to Optionee or his Nominee on a first refusal basis all such timber and timberlands or the logs produced therefrom as their said available funds make possible and will also offer as aforesaid such peelable logs as they acquire, all at cost to Optionors or at then current applicable market, as shall be agreed from time to time by said Optionors and Optionee or his Nominee. The financing and operation of said timber

The trial court found that Washington, through its general manager, Mr. Braedt, advised Walton in January, 1956, that "The log situation is getting pretty tight . . . our log inventory is uncomfortably small . . . we request that a real effort be made on your part to use your best efforts to acquire and offer to us all possible timber and peeler logs according to the contract. . . ."; that Washington's need was known by Walton; that Walton did not use its best efforts, or any efforts, to acquire and offer timber and logs under paragraph 13A. These findings are supported by substantial evidence and we accept them. In fact, it is obvious that although Walton was willing to loan money at interest, even in excess of $500,000 for purchases by Washington, Walton did not intend to undertake the risks of purchasing timber or conducting a logging operation. This constituted a breach of contractual duty.

The trial court further found that after Walton did nothing to relieve the shortage of logs, Washington purchased, on bid, the so-called Jack Davis timber in Oregon. To finance this purchase, $350,000 was borrowed from Walton.

" . . . The market price of plywood dropped and as these changed market conditions made uneconomic the transportation of the peeler logs produced from this timber to Everett, Washington for use at the mill, Washington was obliged to liquidate the same and sustained a further loss to its damage in the additional sum of $231,649.55.[7] These

company, as set forth in this paragraph 13, shall continue throughout the terms of the Sales Agreement referred to in paragraph 16 hereof and a default in this condition shall terminate said Sales Agreement, provided said default shall not have been cured within thirty (30) days after written notice thereof is given to the Sales Company by Optionee or his Nominee.

"B. Optionors shall finance the purchase of additional peeler logs by the Optionee or his Nominee, during the period of the Sales Agreement hereinafter referred to, if requested, by advancing from the available funds referred to in subparagraph A of this paragraph, seventy-five (75%) per cent of the cost of each such purchase to be evidenced by a promissory note bearing interest on unpaid balances at the rate of five (5%) per cent per annum, and payable in one year; Provided, however, that said promissory note shall be secured by a warehouse of or a chattel mortgage on said logs, in form satisfactory to the Optionors."

7This is the substantial item included in (1) $322,004.51.

losses in damages were reasonably in the contemplation of the parties at the time of the execution of the Option Agreement, and were the natural and proximate result of optionor's breach of Section 13A."

These facts, disregarding mixed conclusions, are supported by substantial evidence and are, of course, binding upon this court.

Respondent's position in support of the inclusion of the sum of $231,649.55 in the judgment, as it applies to the question of reasonable foreseeability, we will state in some detail. In our opinion this is the controlling rule. No purpose is served in considering other of the numerous areas probed by counsel.

■ The framework, within which we must measure rights on this issue, is bounded by the following: (1) damages for breach of contract in this state can be recovered only for such losses as were reasonably foreseeable by the party to be charged, at the time the contract was made. *Lewis v. Jensen,* 39 Wn. (2d) 301, 235 P. (2d) 312; (2) if the injury was not foreseeable, then it must specifically be shown that the defendant had special knowledge of the risk he was undertaking. *Dally v. Isaacson,* 40 Wn. (2d) 574, 245 P. (2d) 200.

In the wisdom of hindsight, the Davis purchase was, indeed, ill-advised. However, respondents argue that at the time of purchase, raw material on hand supplied less than a month's need. Peeler logs were not available in quantity on the open market. It had been necessary to purchase considerable green veneer to augment supply, which was not a profitable method of operation. A major source of raw supply seemed vital. At the time of purchase, it was believed that the Davis tract would supply one-third of the needs of Washington for a period of 2 years. Washington exercised its best judgment, and this purchase was reasonably foreseeable.

Respondents argue further, that the fact that, at the time of the purchase, stumpage prices were at an all-time high, and that shortly thereafter prices fell, is not the test of defendant's liability.

"The existing rule requires only reason to foresee, not actual foresight. It does not require that the defendant should have had the resulting injury actually in contemplation . . . but in general damages are awarded for a breach not because they were contemplated and promised to be paid, but to compensate the injured party for harm done that ought to have been foreseen whether it was or not." 5 Corbin on Contracts § 1009, p. 67.

Further, respondents point out that it has often been said that parties entering into a contract rarely contemplate damages as such, but rather the benefits which may be expected to follow from the promises. The court actually deals in fiction when it enters the field of damages. The true test is not necessarily what appellants foresaw, but what a reasonable man in the position of appellants would have foreseen as the probable action Washington would take as a result of the breach. When this test is met, neither foreseeability of a specific injury, nor the exact amount of the harm, is required, if it proximately results from the breach. Damages, even though not general, which follow a breach because of special circumstances, are actionable so long as they are the direct and proximate consequence of the breach.

5 Corbin on Contracts § 1012, p. 79, concludes on the point that

"The question whether or not the defendant did in fact foresee, or had reason to foresee, the injury that the plaintiff has suffered is a question of fact . . . . The rule itself has been applied in thousands of cases. . . ."

Respondents conclude that whether the special circumstances of a falling market were foreseeable, is not material for, "In case of a breach of contract by one party, the other is justified in making reasonable efforts to avoid harm. . . . Justice requires that the risks incident to such reasonable efforts should be carried by the party whose wrongful conduct makes them necessary, . . ." (1 Restatement of Contracts § 336 Comment 2e) ". . . provided the injured party acted in good faith in making such efforts and upon a reasonable belief that they would be

successful. . . ." (15 Am. Jur., Damages § 147, p. 555). See also *Snowflake Laundry Co. v. MacDowell*, 52 Wn. (2d) 662, 328 P. (2d) 684.

We are induced to scrutinize closely the factual basis of the trial court's conclusion that "these losses and damages [$231,649.55] were reasonably in the contemplation of the parties at the time of the execution of the option . . . ." Unquestionably, the parties knew that Washington needed 2 million feet of peeler logs each month for ordinary operation, and a total of not less than 8 million feet for winter use, during which period there was little logging. When we consider that a reasonable backlog is necessary in order to utilize profitably the capabilities of log supply in the light of orders, it must be said that the supply was critical.[8]

The estimated harvest in peeler logs from the Davis tract was 16 million feet. However, in January 1956, when Washington bid on the Jack Davis timber, and subsequently when the sale was completed, it was obvious that none of the Davis timber, 300 miles distant from the mill in Everett, could possibly be converted into peeler logs and transported for use until after logs in the vicinity of Everett became available. Thus, the purchase of the Davis timber could by no stretch relieve the critical situation of January 1, 1956.

"When Walton did nothing to relieve the shortage of logs in January, 1956 . . . ." is a negative finding which must be restricted. Walton did nothing under paragraph 13A, to be sure; however, the record does not support an unlimited finding that Walton did nothing. Walton made available $500,000 for procuring raw material, pointed out the difficulty of timber cruising during the winter, suggested an early meeting "to discuss plans for log and timber buying when the woods open up in the spring," and was otherwise active.

---

[8] The log inventory for the critical months showed: January 1, 1956—3,727,770 feet; February 1, 1956—2,470,560 feet; March 1, 1956—3,069,296 feet; April 1, 1956—1,987,142 feet; May 1, 1956—2,433,490 feet; June 1, 1956—3,148,072 feet; and July 1, 1956—4,518,885 feet.

Commencing on November 29, 1955, and continuing throughout the critical period, R. E. Walton made numerous contacts with various suppliers of peelers relative to the purchase of logs, relative to securing priority and preference rights, and with reference to advancing funds, or guaranteeing faithful performance of stumpage sale contracts. Moreover, when Mr. Braedt, on January 18, 1956, demanded best efforts under paragraph 13A, he advised Walton that "while we are receiving some deliveries right along and have commitments in sight at the present time, most of these deliveries will not materialize until spring, or perhaps even late spring."

An additional factor bearing on the question of reasonable foreseeability is the season of the year during which the contract obligations were assumed. On November 1, 1955, Washington entered into possession of the mill and acquired an inventory of 5,652,460 feet of peeler logs. There was no commitment that a larger inventory would be on hand at the time of transfer. It is common knowledge that both fir and cottonwood of a size suitable for peeling, in the main, are found only above the snow line, and cannot be logged during the winter months. There is no credible evidence that Walton, during the critical period mentioned, could by performance of paragraph 13A have increased Washington's stockpile of logs. It seems obvious that the only source of augmentation during the period was the purchase of logs from other sources by Washington under paragraph 13B.

Under the recited facts, we entertain grave doubts that a reasonable person in Walton's position, under the circumstances, would have foreseen the purchase of the Davis tract by Washington at the time the contract was made. We do not question an exercise of its best judgment, but we conceive no logical motivation, unless it be (a) a change of policy, or (b) ill-advised haste.

Mr. Braedt retired as manager in April, 1956. Mr. Atkinson, Mr. Lung, and others, who followed as Washington's managers, were of the opinion that it would be for Washington's best interest to purchase its own timber and secure financing from Walton. This plan was put into operation in

the spring of 1956 and secured enthusiastic approval from Walton. It was an entire departure from paragraph 13, and will not support damages under 13A.

Furthermore, we do not think it was reasonably foreseeable that Washington would be motivated by panic or fear. "To look for a fig in winter," Marcus Aurelius reputedly said, "is a madman's act." Paraphrasing, to expect Walton to log and supply peelers in winter was unreasonable, to say the least. There was no urgency in January of 1956. After logging operations became feasible in the spring of 1956, if Walton had ignored the responsibility to assist in the procurement of supply, the purchase of timber, even distant from the mill, might reasonably be foreseen. But, as pointed out, Walton was active in scouting available timber, as well as logs. It appears that even in December 1955, R. E. Walton had made arrangements for Mr. Basil Funk of Washington to look over several available log rafts, and Walton wrote several letters to Washington during the critical period relative to sources of supply. In view of these continuing efforts, does the rule, as hereinbefore suggested, apply?

The rule is stated in Restatement of Contracts § 330:

"In awarding damages, compensation is given for only those injuries that the defendant had reason to foresee as a probable result of his breach when the contract was made. If the injury is one that follows the breach in the usual course of events, there is sufficient reason for the defendant to foresee it; otherwise, it must be shown specifically that the defendant had reason to know the facts and to foresee the injury."

It is approved in *Dally v. Isaacson, supra,* and *Winslow v. Mell,* 48 Wn. (2d) 581, 295 P. (2d) 319.

Unless we depart the bounds of reason and logic, we must disagree with the trial court. Chronologically, the events had not closed the door or created an emergency. Shortly before the Davis purchase, Walton had suggested to Washington, by letter, an early meeting "to discuss plans for log and timber buying when the woods open up in the spring." As seen, Walton was actively engaged in gathering data of possible supply sources. The fact that Mr. Braedt wrote

on this letter the notation: "Has any effort been made? I think not." was unknown to Walton. Under the circumstances, there was no reason for one in Walton's position to foresee the trepidation and fear of closure which must have motivated Washington. We hold that damages awarded for breach of paragraph 13A in the amount of $231,649.55 must be disallowed because the purchase was outside the area of reasonable foreseeability.

The second component of item (1) $322,004.51, is the sum of $90,354.96, representing interest paid by Washington to Walton for money advanced during the period of operation. The basis is expressed in the following mixed finding and conclusion:

"Funds were available for use under 13A, but were never used for that purpose, as a result of which, Washington was damaged in the sum of $90,354.96, as unwarranted interest under 13B."

The trial court is saying that although operation under 13B (purchase of logs from third parties by Washington) carried interest, operation under 13A (purchase by Walton) did not, and that Walton should have operated under 13A and avoided all interest charges.

We think this is *non sequitor.* A fund of $500,000 was provided by Walton, not a self-replenishing fountain of credit. Had Walton operated under paragraph 13A, timber purchased, not suitable for peeling, would have represented an investment and, until sold, would have reduced the amount available for additional purchases. Or assume that Walton had purchased the Davis tract under paragraph 13A. It seems obvious that the loss sustained would have cut the fund almost in half. To say that Walton must, under paragraph 13A, advance unlimited funds to satisfy all supply needs of Washington cannot be read into paragraph 13. Nor can we conclude that $500,000, so expended, would have done so.

Appellants argue that, by mutual agreement, the parties substituted a different method of procedure in lieu of paragraph 13A. We disagree. Parenthetically, the new method covered the direct purchase of timber by Washington from

sources other than Walton. This differed from purchase by Walton of timber or logs for resale to Washington (13A). It also differed from the purchase of peeler logs by Washington from sources other than Walton (13B). There is neither expression nor reasonable inference to conclude that Washington intended to surrender the advantage of operation under paragraph 13A. The parties, in effect, added to and supplemented paragraph 13 by a new agreement. It stands on its own four corners.

Cash advances for the purchase of standing timber by Washington were evidenced by promissory notes drawing interest. Thus, the construction given to the contract supplementation evidences an intent to charge interest. In fact, there are no other probative circumstances to aid us. Respondents suggest that interest payments were not a matter of agreement; that Washington had no credit; that Walton's constant threat of foreclosure was an effective club; and Washington was coerced into the payment of interest.

Granting that Washington was at a distinct disadvantage in dealing; nonetheless, after Mr. Braedt requested performance under paragraph 13A, no other demand was ever made to perform under 13A.

The record discloses no protest to the payment of interest, no refusal to pay, and no claim in that area until the present action was instituted.

Interest was collected on logs purchased for Washington by Walton in the amount of $17,517.50. This was pursuant to paragraph 13A and, as indicated, payment of interest was improper. All other items of interest charged, we think, were proper. To summarize, item (1) $322,004.51 must be reduced to the sum of $17,517.50.

The second alleged breach of contract by Walton involves the following component of the judgment: (2) $3,500,000. It stemmed from paragraph 6 of the contract, referred to as the Sales Contract.[9] Respondents suggest that the court

---

[9]The relevant provisions provide:

"The parties recognize that it is to their mutual advantage to maintain maximum production consistent with most profitable plant operation, and to that end Sales Company agrees to use its best efforts with

accepted Richard E. Walton's conception of an agent's duty and obligation thereunder.[10]

We summarize the court's findings: Washington, during its operation, because of lack of orders, operated at only 40 to 50 per cent of capacity (the rate of production of the 126 members of the Douglas Fir Plywood Association, during the period, was over 85 per cent of capacity); its most profitable plant operation necessitated a production of 30 to 50 per cent in specialties, namely, medium and high density plastic overlays, cottonwood, and a patented medium density siding; that orders in a favorable ratio permitting a profitable operation never were secured; an inadequate order file did not permit efficient and economical planning and operation; on the contrary, Washington was often required to fill orders, including those known to the trade as "odd ball" (of nonstandard size or thickness, which resulted in more man hours, poor log recovery, and depletion of facing stock); Walton, as agent, did not use its best efforts as required by the sales contract; Walton did not establish or maintain an adequate national sales organization; circumstances placed Walton in a position where Walton hampered and impeded Washington in making sales to third parties or from selecting other agents; these cir-

due and reasonable diligence to obtain orders consistent with Manufacturer's productive ability, log supply and operating efficiency.

"Sales Company agrees to establish and maintain a national sales organization sufficient to enable it to be in a competitive position to obtain orders for Manufacturer's products. . . ."

[10]"Q. . . . do you consider that under that part of the agreement that it was the duty of the sales company to obtain orders first in quantity to permit the mill to maintain its maximum production? A. Absolutely. Q. And obtain orders in quality which were consistent with the manufacturers productive ability, log supply and operating efficiency? A. With reasonable diligence, it says. Yes. Q. And in other words, it was the obligation of the sales company to secure both an order file adequate—and I believe you said this morning that you considered an order file of two to three weeks was the proper order file for a mill to have,— A. For that particular plant. Q. Yes,—and of the type of orders that the mill could operate on most efficiently and make the greatest profit? A. Yes. Q. In other words, the sales company is supposed to operate as an agent for the benefit of the manufacturer? A. That is correct."

cumstances included Walton's threat of foreclosure; Richard E. Walton's domination of a proxy committee which was placed in control of Washington during the year 1958, and which selected R. E. Walton as president of Washington and made him a member of its board of directors. Washington's loss from operations of the mill during the period of approximately 5½ years was $1,291,000.

Appellants cannot escape the force of these findings. Suggested causes of Washington's loss advanced by appellants, such as poor market conditions for the sale of fir plywood, an inferior product, unrealistic and noncompetitive sales prices, and mismanagement were rejected by the trial court. A consideration of all the evidence in this area would unduly enlarge this opinion. Suffice it to say, substantial support for the court's determination is found in the voluminous statement of facts and, with one exception hereinafter noted, are accepted by us.

Before we approach the complexities in the field of lost profits, it is first necessary to measure support for the court's determination of liability. It was found that Williams Plywood Company, Walton's sales agent, with a limited staff in Indianapolis, Indiana, selling to some 60 jobbers in only a portion of the 65 major marketing areas in the United States, was not a national sales organization as defined in the sales contract. We do not criticize this finding, for it is well supported. To complicate matters, Williams Plywood Company, shortly after Washington started production, secured a new, and to an extent, a competitive account and thereafter divided its efforts between the two. The court also found that Walton had not used its best efforts as required under the sales contract, in that Walton had obstructed and hindered third party sales and the appointment of other sales organizations as nonexclusive sales agents, but had insisted that Williams be retained as its exclusive sales agent. As R. E. Walton testified, "We had the exclusive contract for their production and we did not believe they could go out and hire another sales agent to handle their business . . ."

These circumstances do not measure up to "best efforts." See *White & Bollard, Inc. v. Goodenow,* 58 Wn. (2d) 180, 361 P. (2d) 571.

Washington's prospectus filed with the Securities and Exchange Commission by its promoters contains, *inter alia,* the following:

". . . Walton Plywood presently maintains an experienced sales force with 3 full-time salesmen and an office staff in Indianapolis, Indiana [Williams Plywood Company]. They travel the midwest and east where about 90 per cent of production of the mill is sold. It is expected optionors will continue this staff and policy."

Appellants argue that Washington thereby equated Williams Plywood Company with "national sales organization." We cannot agree with this thesis. The prospectus is not a part of negotiations, nor a contract, but is primarily an informational statement to prospective purchasers of corporate stock. Such a constriction in meaning does not conform to Mr. Walton's own understanding that a national sales organization "should have truly national distribution, geographic distribution in all of the states." Augmentation was clearly necessary. We find no merit in this assignment of error.

Are lost profits recoverable? The modern view is that they are properly recoverable as damages when (1) they are within the contemplation of the parties at the time the contract was made, (2) they are the proximate result of defendant's breach, and (3) they are proven with reasonable certainty. See *Hole v. Unity Petroleum Corp.,* 15 Wn. (2d) 416, 131 P. (2d) 150; McCormick on Damages § 25.

The first rule poses no problem, for it was clearly foreseeable that if the contract was breached there would be lost profits on national sales. Most contracts are motivated by the expectation of future profits. If such profits are within the contemplation of the parties at the time the contract is made, they may form the measure of damage. *Federal Iron & Brass Bed Co. v. Hock,* 42 Wash. 668, 85 Pac. 418; *Wakeman v. Wheeler & Wilson Mfg. Co.,* 101 N. Y. 205, 4 N.E. 264; Restatement, Contracts § 330.

The second rule requires certainty as to the fact that damage resulted from defendant's breach. *Dunseath v. Hallauer,* 41 Wn. (2d) 895, 253 P. (2d) 408; *Gaasland Co. v. Hyak Lbr. & Millwork,* 42 Wn. (2d) 705, 257 P. (2d) 784.

The third rule requires that lost profits must be proven with reasonable certainty or conversely, damages which are remote and speculative cannot be recovered. *Bromley v. Heffernan Engine Works,* 108 Wash. 31, 182 Pac. 929; *National School Studios v. Superior School Photo Ser.,* 40 Wn. (2d) 263, 242 P. (2d) 756.

The related findings, in our opinion, fully meet the tests as contained in rules 1 and 2, and we, therefore, devote our attention to rule 3.

█ A measuring stick, whereby damages may be assessed within the demarcation of reasonable certainty, is sometimes difficult to find. Plaintiff must produce the best evidence available and

" . . . if it is sufficient to afford a reasonable basis for estimating his loss, he is not to be denied a substantial recovery because the amount of the damage is incapable of exact ascertainment. . . ." *Dunseath v. Hallauer, supra,* p. 902.

See also *Buchanan v. Hammond,* 54 Wn. (2d) 354, 340 P. (2d) 556.

█ The usual method of proving lost profits is from profit history. It is argued that where a plaintiff is conducting a new business with labor, manufacturing and marketing costs unknown, prospective profits cannot be awarded. This is the so-called new business rule and has long been the law of Washington. *Engstrom v. Merriam,* 25 Wash. 73, 64 Pac. 914; *Webster v. Beau,* 77 Wash. 444, 137 Pac. 1013; *Andreopulos v. Peresteredes,* 95 Wash. 282, 163 Pac. 770; *Lockit Cap Co. v. Glove Mfg. Co.,* 158 Wash. 183, 290 Pac. 813; *Hole v. Unity Petroleum Corp.,* 15 Wn. (2d) 416, 131 P. (2d) 150; *Ingersol v. Seattle-First Nat. Bank,* 63 Wn. (2d) 354, 387 P. (2d) 538.

Respondents deny that Washington's continuation of the Walton Plywood Company business under the extant circumstances was a new business. They suggest that, in any

event, the reasons for the rule vanish when analysis of market conditions and a profit showing of identical or similar businesses in the vicinity, operating under substantially the same conditions is made. *Bigelow v. RKO Radio Pictures, Inc.*, 327 U. S. 251, 90 L. Ed. 652, 66 S. Ct. 574. The rule is succinctly stated in *Barbier v. Barry*, 345 S. W. (2d) 557, 563 (Tex. Civ. App. 1961), as follows: ". . . lost. profits will not be denied merely because a business is new if factual data is available to furnish a basis for computation of probable losses. . . ." Its rationale is stated as follows: ". . . Where the fact is well established that profits would have been made and the difficulty in proving their amount is directly caused by the defendant's breach, a greater liberality is permitted in making estimates and drawing inferences. . . ." 5 Corbin on Contracts § 1023, p. 133.

Respondents point out that a reasonable method of estimation of damages is often made with the aid of opinion evidence. Experts in the area are competent to pass judgment. So long as their opinions afford a reasonable basis for inference, there is departure from the realm of uncertainty and speculation. Expert testimony alone is a sufficient basis for an award for loss of profits. *Bogart v. Pitchless Lbr. Co.*, 72 Wash. 417, 130 Pac. 490; *Bromley v. Heffernan Engine Works*, 108 Wash. 31, 182 Pac. 929, and *Warner v. Channell Chemical Co.*, 121 Wash. 237, 208 Pac. 1104.

The trial court decided that the cases cited above state a reasonable rule of necessity when opinion evidence is the best evidence available. On that basis, respondents' prospective profits were proven.

Mr. Millard Hahn, an industrial management engineer, well qualified as an expert, testified. He had made an industry-wide study to compare the cost of operation of worker-owner plywood companies against the costs of privately owned companies. He had worked with 30 plywood mills. In addition to his own knowledge, he studied reports of industry averages, studied Washington's loss record and included manufacturing and overhead costs in his calculations. His opinion was that the difference be-

tween the calculated loss on actual production and the lost profit was $4,559,000.

Mr. P. F. Goodson was well qualified as an expert on all phases of the operation of Washington. He had not only industry statistics, the business records of Washington, its annual financial statements containing the data relating to costs, price lists for its products which were available to all the experts who testified, but he also had been an employee of the mill since 1947 and had a broad experience as workman, administrative officer, and finally as general manager of Washington. His testimony covered a period during the fall of 1960, when Washington, in spite of a low market price of fir plywood, was able to make a modest profit on a curtailed production schedule.

Mr. Earl Shinn had a long experience in the plywood industry in management and selling capacities. He was an employee of Washington for a number of years, and served as manager from April 1958, to July 1958. He was competent to testify.

Mr. Enar Erickson had worked in the plywood industry since 1942 in the major phases of operation, and, from 1947 to 1958, he was general manager of a plywood company. He was general manager of Washington from March 1959 to August 1959. During this period, the plywood market reached its highest peak in recent years; production of Washington was close to its peak, and it achieved substantial profits. This witness qualified as an expert.

We concur with the trial court's determination that each of the expert witnesses was qualified to form an estimate and express a judgment on the subject matter. The weight to be given the testimony was for the trial court to determine.

The court adopted a figure below that fixed by Mr. Hahn and above the figures of the other experts. The fact that no evidence sustained the exact sum allowed is not pertinent.[11]

Subtracting the total losses from the award, it is seen that

[11]" . . . Damages depending on varying estimates cannot be measured with mathematical nicety. It is enough that the judgment is within the evidence. . . ." *Bogart v. Pitchless Lbr. Co., supra,* p. 420.

lost profits were computed by the court at approximately $2,209,000 for the 5½ year period, or approximately $401,636 a year. There was no comparable mill from whose history of profits this figure could have been entirely drawn, for Mr. Hahn testified there were no comparables.[12]

We agree that had best efforts been directed in pursuit of a profitable market in specialty items, profits would have been realized. The trial court made it clear that it was guided by the opinions of the expert witnesses. The trial court can exercise a degree of liberality in drawing inferences from the expert testimony and ordinarily this court cannot substitute its own judgment in the matter.

Although expert testimony is a sufficient basis for an award of lost profits, their opinions must be based upon tangible evidence rather than upon speculation and hypothetical situations. *Bogart v. Pitchless Lbr. Co., supra.* Consequently, our judicial concern is limited to the question: Was there a substantial and sufficient factual basis upon which the respective opinions could be based? *Warner v. Channell Chemical Co.,* 121 Wash. 237, 208 Pac. 1104.

We note that each expert witness assumed an order file in the volume and type of orders that Washington could most profitably fill. In other words, the assumptions, in part, were based upon hypothesis.

We realize the practical difficulty in presenting a complete analysis of supply and demand, as it relates to Washington's specialties. To illustrate, there were approximately a dozen mills profitably producing a product similar to plastic overlays. To achieve a 30 per cent production for Washington in plastics, it would have been necessary to sell a large, disproportionate share of the total national market in plastics. We find no assurance from the testimony of sales agents that sales of Washington's specialties in the volume on

---

[12]"May I say that in my work with 30 plywood mills, there are no two mills alike. They are 100 per cent different. Even those mills which were built from identical blueprints and identical equipment, produce types of species of plywood differently. There are no comparable mills from that standpoint. One may produce 100 per cent fir or one makes specialty items. The percentages of specialty items varies in all mills."

which the expert opinions were based, could, in fact, have been made. Thus, the assumption of sales of specialties in the required volume, as made by the expert witnesses, is in the area of speculation. The same void encompasses all of Washington's specialties. So based, it does not support lost profits in the amount of $3,500,000.

We conclude that the rule of reasonable certainty is satisfied only by a consideration of Washington's own profit experience. It is noted that during a period of extremely low sale prices in the fir plywood market, which was the general condition throughout the period, Washington realized a modest profit by interplant sales of its profitable specialties, as follows: during August, 1960, a profit of $4,800; during September, 1960, a profit of $13,267; during October, 1960, a profit of $10,900. If this actual experience were taken as a gauge of lost profits, the annual profit would have approximated $115,868. It is unfortunate this practice did not continue long enough to glean a more reliable average. However, this fault lays at the door of Walton, for when Williams Plywood Company protested the practice, Mr. Walton insisted that it be stopped.

The trial court found that Mr. Walton largely dictated Washington's activities, he caused its managers to be discharged when they disagreed with him, and he thwarted Washington's efforts to rise above Williams Plywood Company's inability to provide an adequate order file. Credible evidence supports these findings. As a fiduciary in his capacity as exclusive sales agent, we are unable to understand his lack of fidelity as evidenced by constant, unjustified interference in Washington's attempts to survive.

We now detail. Washington's total loss was $1,291,000; $181,000 occurred during the first 6 months of operation, when the mill workers, according to the witness Ted Goodson, had "no experience whatsoever, from clerks to farmers, to druggists, to teachers, bartenders, I would say better than half of the crew was completely inexperienced. Probably two-thirds of it." It is undisputed that, during this period, difficulties were experienced in production. We

disallow this loss as an item of damage. The accountable loss is thus reduced to $1,110,000. To this figure is added profits on the basis as indicated, $115,868 per year, and realizing that there are always untoward factors which affect profit and loss, we reduce and fix lost profits at $400,000. Admittedly, this award of lost profits is not based upon mathematical nicety; however, a reasonable degree of certainty and exactness is all that is required. *California Eastern Airways v. Alaska Airlines,* 38 Wn. (2d) 378, 229 P. (2d) 540.

To recapitulate, judgment is approved as follows: (1) in the sum of $17,517.50 for breach of paragraph 13A; (2) in the sum of $1,510,000 for breach of sales contract; (3) in the sum of $1,348.05 for costs. The judgment as granted by the trial court is, therefore, reversed.

If respondent accepts the judgment as reduced within 20 days after remittitur, and in the total amount of $1,528,-865.55 plus the minor items not reviewed, it may be so modified. Otherwise, a new trial is granted, to be limited to the issue of lost profits.

OTT, C. J., HILL, ROSELLINI, and HUNTER, JJ., concur.

[En Banc. November 19, 1964.]*

PER CURIAM.—Upon a rehearing en banc, a majority of the court adheres to the departmental opinion filed herein, with the following modification: The total judgment awarded in the departmental opinion was $1,528,865.55. Included in this total award were two inadvertent arithmetical errors, (1) $231,649.55, a loss item in the Jack Davis transaction which was not approved by the court, and (2) $17,517.50 for breach of paragraph 13A which was a duplication of a loss item previously included.

The total amount of the judgment to be entered by the trial court is hereby reduced to $1,279,698.50. In all other respects, the departmental opinion is affirmed.

A new trial is granted, limited to the issue of loss of profits only, unless the respondents, within 20 days after

*Reported in 396 P. (2d) 879.

remittitur, accept the reduction in the amount of the award, as directed herein and in the departmental opinion.

In accordance with Rule on Appeal 55(b)(1), respondents will recover costs.

The remittitur shall be transmitted to the trial court forthwith.